******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOSEPH STRYCHARZ ET AL. *v.*
RICHARD D. CADY ET AL.
(SC 19507)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued November 6, 2015—officially released November 15, 2016*

*Albert L. J. Speziali*, with whom, on the brief, were
*Thomas J. Keramidas* and *Paul Costa*, for the appellants (plaintiffs).

*Scott R. Ouellette*, with whom, on the brief, were
*James G. Williams* and *Ryan J. McKone*, for the appellees (defendant town of Colchester et al.).

*Opinion*

PALMER, J. The named plaintiff, Joseph Strycharz,[1] commenced this action against the defendants Karen A. Loiselle, the superintendent of schools for the town of Colchester, Jeffry P. Mathieu, the principal of Bacon Academy (school), a public high school in the town of Colchester, Dale J. McCubrey and Ross Sward, assistant principals, William D. Hettrick, John Mazzarella, Elizabeth A. Ciccione, Linda M. Hodge, and Andrew C. George, Jr., members of the Board of Education of the Town of Colchester (board), and the town of Colchester (town), among others,[2] after he was struck by a vehicle at the intersection of Norwich Avenue and the school's driveway on the morning of September 20, 2007. The plaintiff sought damages from the defendants for negligent supervision of school staff and students during school hours and indemnification from the town for those defendants' negligence pursuant to General Statutes (Rev. to 2007) § 7-465.[3] The town, Loiselle, Mathieu, McCubrey, Sward, Hettrick, Mazzarella, Ciccione, Hodge, and George, among others, moved for summary judgment, claiming, inter alia, that governmental immunity shielded them from liability.[4] The trial court granted the motion with respect to those defendants as to the counts directed at them after concluding that their duty to supervise school staff and students was discretionary, and, as a consequence, they were shielded from liability by governmental immunity. Although the trial court concluded that the responsibilities of Mathieu, McCubrey and Sward also included a ministerial duty to assign school staff to supervise students during school hours, the court also determined that they, too, were entitled to summary judgment because the undisputed evidence established as a matter of law that they had discharged that ministerial duty. On appeal,[5] the plaintiff claims that the trial court improperly granted the motion for summary judgment. We agree with the plaintiff that the trial court improperly granted the motion for summary judgment as to McCubrey and Sward with respect to the plaintiff's claim that they breached their ministerial duty to assign school staff to supervise students during school hours. We uphold the granting of the motion for summary judgment in all other respects.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. The school is located on Norwich Avenue in Colchester. Norwich Avenue is a two lane, bidirectional, undivided state highway approximately thirty feet wide with an average daily traffic volume of approximately 5600 vehicles in front of the school. Although the posted speed limit where the school is located was forty miles per hour, approximately 15 percent of vehicles travelled at speeds near or above fifty miles per hour.[6] To enter or leave school property, pedestrians used a crosswalk located at the intersection of Norwich Avenue and the

school's driveway entrance. Because the school's student body had grown to about 1000 by 2006, the intersection was the site of heavy traffic on school day mornings and at dismissal time.[7] The entire student body arrived each morning in a span of approximately twenty minutes, resulting in heavy vehicular traffic from school buses, student drivers, and parent drivers who were dropping off their children.[8] Despite the heavy traffic and congestion, the intersection had neither a traffic light nor a person directing traffic, and the relatively small number of students who walked to and from school had to traverse Norwich Avenue unassisted.

For some time, the safety of the intersection in front of the school had been a matter of concern for the town and school administrators. In light of these concerns, in the spring of 2006, Loiselle and Jenny Contois, the town's first selectperson, organized a committee of school and town administrators and local and state police officers to address traffic and pedestrian safety at the intersection. The committee undertook an initiative that called for, inter alia, the cutting and trimming of trees to improve sight lines at the intersection, continuing education of student drivers about safe driving, petitioning the state to install a traffic signal, and continuing regular police enforcement of speed limits in the vicinity. In addition, the iniative expressly directed Loiselle to investigate options for hiring a traffic agent for the intersection. Sometime after the committee was formed, Loiselle, at the request of the board, contacted the Connecticut Interlocal Risk Management Agency (CIRMA), an insurance carrier for the board and the town, and requested, among other things, that it assess the need for a traffic agent at the intersection. In response to Loiselle's request, Jeffrey Rogers, CIRMA's risk control consultant, assessed the intersection and made several recommendations, including a recommendation to use a trained traffic agent and to install signs at the entrances to the crosswalk that would advise pedestrians not to enter the roadway until it was safe to do so. Thereafter, the board reviewed CIRMA's recommendations and, on June 19, 2007, instructed Loiselle to contact the town's police commission "regarding a shared responsibility for the crossing guard/traffic agent." When Loiselle addressed the police commission on July 23, 2007, she indicated that there was "an immediate need" for a crossing guard at the intersection. The police commission agreed that a traffic agent at the intersection was needed but informed the board that the town would have to shoulder the cost. On August 15, 2007, the board voted to hire a traffic agent for the intersection, with one member noting that "this was a small investment for . . . student safety." The traffic agent could not commence work, however, until the new budget was approved in October, 2007.

In the meantime, the school maintained an ongoing

student supervision program designed to enhance student safety. In accordance with that program, Mathieu was responsible for assigning school staff to supervisory duties throughout the school. As part of the program, two staff members were assigned, on a weekly rotating basis, to the bus port, both in the morning and in the afternoon. One of the reasons for the morning duty was to ensure that arriving students did not leave the school premises and safely proceeded directly into the school building. Instead of assigning school staff members to their posts personally, Mathieu delegated that duty to McCubrey.[9] According to McCubrey's deposition testimony, she drafted a duty roster each summer before the start of the school year and then provided it to school staff members. The roster informed staff members about their assigned dates, times and respective posts, and advised them of expectations and responsibilities with regard to their duties, including the bus port duty.[10]

In the summer before the school year commencing in the fall of 2007, however, McCubrey was out of work on medical leave. As a result, McCubrey prepared the outlines for the duty roster and submitted them to Sward's office, where, as McCubrey explained, the outlines may have been "tweaked" further.[11] She was unable to identify, however, who had received the outlines or what happened to them following their submission to Sward's office. Nevertheless, McCubrey insisted, both in her responses to the plaintiff's interrogatories and at her deposition, that the roster had been finalized and distributed to the staff by the beginning of the school year.[12] No copies of the outlines or the actual roster could be located, however. In addition, the school was unable to produce the names of persons assigned to bus duty on the day of the accident or during the two weeks immediately preceding it.

The plaintiff followed a regular routine on school days beginning on September 5, 2007, the first day of the school year, and continuing until the day of the accident on September 20, 2007. The plaintiff took the school bus every morning and arrived at school at 7:15 a.m. On most days, upon his arrival at the school's bus port, the plaintiff would walk back to the crosswalk, traverse Norwich Avenue to leave school grounds, and smoke a cigarette before returning back to the school to attend classes.[13] During that two week period culminating on September 20, 2007, the plaintiff observed "many" other students who had taken the bus to school smoking cigarettes in the same area. At no time, however, did he see anyone from the school staff at the bus port during that time, and no one ever directed him to go into the school building or attempted to stop him from leaving school grounds.

On the morning of September 20, 2007, the plaintiff, who had just begun his freshman year, took the bus to

school, and, while on the bus, he and his friend, Alexander Lily, decided to have a cigarette before going to class. The boys agreed to leave school grounds by crossing to the other side of Norwich Avenue even though they knew that doing so without explicit authorization violated school policy. Once at the school's bus port, the plaintiff and Lily conversed momentarily and then proceeded directly to the crosswalk at the intersection of the school's driveway and Norwich Avenue. As the plaintiff was crossing Norwich Avenue, however, he was struck by a vehicle driven by the named defendant, Richard D. Cady. According to the plaintiff, no school faculty or staff members were visible at the bus port, and no one sought to prevent him from leaving school property.

The plaintiff thereafter commenced this action in October, 2009, asserting that his injuries were caused by Cady's negligence and the negligence of certain other defendants. With respect to the board members, the plaintiff alleged, inter alia, that they had breached their duty to provide a safe school setting in accordance with General Statutes (Rev. to 2007) § 10-220.[14] Specifically, the plaintiff alleged that the board members had failed (1) to implement rules and regulations pertaining to school safety, (2) to take steps to ensure that students did not leave school grounds after arriving at school in the morning, (3) to assign an agent to monitor and direct pedestrian and vehicular traffic at the intersection, and (4) to provide warnings, signage or lights, or otherwise to take steps to give notice to students of the danger of motor vehicle traffic at the intersection.

With respect to Loiselle, the plaintiff alleged that she had breached her duty to enforce the rules governing student safety as required by policy 5142 (a) of the Colchester Public Schools Policies, Regulations and Bylaws (School Policies and Regulations).[15] In particular, the plaintiff alleged that Loiselle failed (1) to implement rules and regulations in accordance with that policy, (2) to inspect and discover safety hazards on school grounds, (3) to properly supervise administrators and staff, (4) to assign a traffic agent at the intersection, and (5) to provide adequate notice to students concerning the motor vehicle traffic at the intersection.

With respect to Mathieu, McCubrey and Sward, the plaintiff, in addition to repeating the averments leveled against Loiselle, alleged that they had breached their duty to protect students from foreseeable dangers. In particular, the plaintiff alleged that Mathieu, McCubrey and Sward had failed (1) to execute their nondiscretionary ministerial duty to assign staff members to bus duty, and (2) to ensure that the assigned staff members did in fact report for and carry out that bus duty. Finally, the plaintiff sought indemnification from the town pursuant to § 7-465.[16]

Certain defendants moved for summary judgment;

see text accompanying footnote 4 of this opinion; asserting that they were entitled to governmental immunity under General Statutes § 52-557n (a) (2) (B).[17] In particular, the defendants contended that they were shielded from liability under the doctrine of governmental immunity because their allegedly negligent acts involved the exercise of judgment or discretion. Those defendants also argued that the plaintiff could not satisfy the only potentially applicable exception to that doctrine—the identifiable person-imminent harm exception—because he could neither establish that he was an identifiable person nor demonstrate that any potential harm was imminent. Finally, insofar as the plaintiff alleged that Mathieu, McCubrey and Sward also had breached a ministerial duty, Mathieu, McCubrey and Sward maintained that the plaintiff presented no evidence to establish a breach of any such duty.

The trial court granted the motion for summary judgment. With respect to the plaintiff's negligence claims against the members of the board, the court concluded that their duty to provide a safe school environment pursuant to § 10-220 (a) (4) was discretionary in nature. The court reached its conclusion because the plaintiff could not point to "any rule, policy, or directive that limits the board's discretion by prescribing the manner in which [the board members] must provide such a setting." The court reached a similar conclusion with respect to the plaintiff's claims against Loiselle. Specifically, the court explained that there was no regulation or policy that limited Loiselle's "discretion by prescribing the manner in which she must provide a safe intersection or supervise morning arrival." Accordingly, the court found that the board members and Loiselle were engaged in discretionary acts and, therefore, entitled to governmental immunity unless the plaintiff could establish an exception to that immunity.

The court, however, also agreed with the contention of the board members and Loiselle that the identifiable person-imminent harm exception to governmental immunity did not apply in the present case. First, the court concluded that the plaintiff could not satisfy the identifiable person element of the exception because the plaintiff, by voluntarily leaving school grounds, had lost "his . . . status as a member of an identifiable class of victims . . . ." In particular, the court determined that, in order for the plaintiff to be considered an identifiable person for purposes of the exception, he had to establish that he was "compelled to be present at the [time when and the] place where the injury occurred . . . because that is where and when the persons charged with protecting [the plaintiff] from harm would expect [him] to be." Although the court determined that the plaintiff became a member of an identifiable class of foreseeable victims when he arrived at school on the school bus, it nonetheless concluded that the plaintiff had relinquished his status as a member

of that class when he left school property of his own accord.

The court further concluded that, even if the plaintiff was an identifiable victim, the intersection in question did not constitute an imminent harm. Specifically, the court concluded that potential harm was not imminent because it was not limited to a discrete time during which an injury could have occurred. In reaching that conclusion, the trial court relied on the principle articulated by this court in *Burns* v. *Board of Education*, 228 Conn. 640, 650, 638 A.2d 1 (1994), overruled in part by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014), in which we held that an icy patch on a school walkway presented an imminent harm to students because the accident could not have occurred at any time in the future but was limited temporally and geographically. The trial court then concluded that, because the risk of an accident at the intersection in question, although possibly substantial, was "ongoing and continuous, rather than imminent and discrete," the present case was governed by *Evon* v. *Andrews*, 211 Conn. 501, 559 A.2d 1131 (1989), in which this court determined that harm was not imminent if it "could have occurred at any future time or not at all." Id., 508. Accordingly, the trial court concluded that, because the plaintiff could not satisfy either prong of the identifiable person-imminent harm exception, it did not apply in this case.

In light of its determination, the trial court then proceeded to examine whether there was a genuine issue of material fact with respect to the violation of a ministerial duty on the part of Mathieu, McCubrey and Sward. With respect to Mathieu, the court first determined that he had a ministerial duty to assign staff members to bus duty pursuant to school policy. The court also concluded, however, that Mathieu had fulfilled this duty by delegating to McCubrey the responsibility to create the bus duty roster.[18] The court further determined that both McCubrey and Sward also had fulfilled their ministerial duty to assign staff members to bus duty by creating the actual roster. With respect to the plaintiff's allegations concerning the duty to ensure that staff members were in fact present at the bus port each day, the court concluded that any such duty was discretionary in nature because the plaintiff had presented no evidence of a particular regulation, policy or directive that dictated specifically how Mathieu, McCubrey and Sward were required to discharge the duty.[19] Finally, on the basis of its conclusion that the individual defendants were entitled to summary judgment as a matter of law on all claims, the court further determined that the town also was entitled to summary judgment as a matter of law because the plaintiff's claims against it were derivative of his claims against the individual defendants. This appeal followed.

On appeal, the plaintiff claims that the trial court (1) misconstrued the nature of the ministerial duty owed by Mathieu, McCubrey and Sward in concluding that it was limited to the preparation of a bus duty roster only, and (2) incorrectly determined that Mathieu, McCubrey and Sward had fulfilled or adequately discharged their ministerial duty to ensure that students were supervised at the school bus port. The plaintiff further contends that the trial court incorrectly concluded that (1) he had relinquished his status as a member of the identifiable class of foreseeable victims when he voluntarily left school property and was injured off school grounds, and (2) the identifiable person-imminent harm exception to governmental immunity is inapplicable in the present case as a matter of law. As to the latter, the plaintiff argues that our decision in *Haynes* v. *Middletown*, supra, 314 Conn. 303, which was issued during the pendency of the present appeal, contradicts the trial court's conclusion that the harm at issue was not imminent.[20]

With respect to the plaintiff's first claim, we agree that, with respect to Mathieu, McCubrey and Sward, the trial court improperly limited the ministerial duty at issue to the preparation of the bus duty roster because that duty extends to ensuring that the roster is distributed to and received by the appropriate staff members. We also agree with the plaintiff that the trial court incorrectly determined that McCubrey and Sward satisfied that ministerial duty as a matter of law because we are persuaded that there remains a genuine issue of material fact as to whether the bus duty roster was created and whether it was timely distributed to staff members. We further conclude, however, that the trial court correctly determined that Mathieu did, indeed, satisfy his ministerial duty because he reasonably chose to delegate responsibility for the bus duty roster to McCubrey. With respect to the plaintiff's second claim, we conclude that, even though the plaintiff left school property and was injured on a public road, he remained a member of the identifiable class of foreseeable victims to the extent that the defendants had a duty to supervise him while under their custody and control. We further conclude, however, that the motion for summary judgment was properly granted with respect to this claim because there is insufficient evidence in the record from which a jury reasonably could conclude that it was apparent to the defendants that there was a risk of imminent harm because students arriving by bus were crossing Norwich Avenue before the start of the school day.[21]

I

We first address the plaintiff's claim that the trial court misconstrued the nature of the ministerial duty owed by Mathieu, McCubrey and Sward insofar as the court limited that duty to the preparation of a bus duty

roster. The plaintiff contends that limiting the duty in that manner would effectively render it meaningless without a corresponding ministerial duty to ensure that the roster was distributed to staff members and that they in fact performed their assignments. We agree with the plaintiff that Mathieu, McCubrey and Sward had a ministerial duty to prepare *and* to distribute the bus duty roster to school staff members. We further conclude, however, that the duty to make sure that school staff members were in fact present at their assigned posts was discretionary.

It is well settled that municipal employees "are immune from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Therefore, [d]iscretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officials and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits . . . from imposing liability for that injury. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, municipal [employees] are not immune from liability for negligence arising out of their ministerial acts, [which are] defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

"Although the determination of whether official acts or omissions are ministerial or discretionary is normally a question of fact for the fact finder . . . there are cases [in which] it is apparent from the complaint . . . [that the nature of the duty] . . . turns on the character of the act or omission complained of in the complaint. . . . Accordingly, [when] it is apparent from the complaint that the defendants' allegedly negligent acts or omissions necessarily involved the exercise of judgment, and thus necessarily were discretionary in nature, summary judgment is proper." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Coley* v. *Hartford*, 312 Conn. 150, 161–62, 95 A.3d 480 (2014). Lastly, "[d]etermining whether it is apparent on the face of the complaint that the acts complained of are discretionary requires an examination of the nature of the alleged acts or omissions." (Internal quotation marks omitted.) Id., 165.

With these principles in mind, we turn to the evidence in the present case. In his complaint, the plaintiff alleged that Mathieu, McCubrey and Sward had failed to execute their ministerial duty (1) to assign school staff members to bus duty, and (2) to ensure that assigned staff members actually reported to and adequately discharged that duty pursuant to the student safety pro-

gram. To support his allegations with regard to the existence and the scope of the ministerial duty, the plaintiff relied on the deposition testimony of Loiselle, who testified that Mathieu had a duty to assign school staff members to different posts, including the bus port, and that he lacked the discretion not to do so. Significantly, however, Loiselle did not provide any testimony with regard to the ministerial duty of Mathieu, McCubrey and Sward to ensure that school staff members actually performed their assignments. We first conclude that this testimony is sufficient to establish that Mathieu, McCubrey and Sward had the ministerial duty to assign school staff members to their respective posts. See *Gauvin* v. *New Haven*, 187 Conn. 180, 186–87, 445 A.2d 1 (1982) (testimony of municipal official can establish nature of duty). We further conclude that, in order to be meaningful, this duty necessarily must also include a corresponding ministerial duty to distribute the bus duty roster among staff members. See *Soderlund* v. *Merrigan*, 110 Conn. App. 389, 397, 955 A.2d 107 (2008) ("[t]he issue is not whether the *procedure* to vacate the warrant was mandatory, but whether it was mandatory to vacate the warrant" [emphasis in original]). After all, a bus duty roster by itself would be useless if it is not distributed to those charged with student supervision, informing them about their respective posts and schedule.

Second, although Loiselle's testimony provided a sufficient basis to conclude that school administrators had the ministerial duty to assign staff members to monitor students throughout the school, her testimony contains no directive sufficient to support a finding that Mathieu, McCubrey and Sward had the ministerial duty to ensure that assigned staff members, once notified of their responsibilities, *actually* reported to and adequately discharged their assignments. Furthermore, the plaintiff has not pointed to anything in the record that can be construed as a directive establishing such a ministerial duty. See *Violano* v. *Fernandez*, 280 Conn. 310, 323, 907 A.2d 1188 (2006) (ministerial acts are acts required by city charter provision, ordinance, regulation, policy, rule or other directive). The only evidence that the plaintiff offers in support of his contention is Mathieu's attestation that he, as the school's principal, "inquired to ensure completion of the assigned task," and that school administrators "periodically walked the school grounds" in order to ensure that staff members were properly carrying out their assigned duties. That evidence hardly supports the plaintiff's argument; on the contrary, the fact that school administrators engaged in periodic compliance checks necessarily implies that they exercised their judgment or discretion in deciding where, when and in what manner to supervise school staff members.

In the absence of any evidence establishing a ministerial duty to ensure that staff members reported to their

posts and adequately discharged their assignments, the crux of the plaintiff's argument is that Mathieu, McCubrey and Sward were negligent in their general supervision of school employees. Although no Connecticut appellate tribunal has had an opportunity to examine whether general supervision of employees in a public school setting is a discretionary or ministerial function, several of our sister states have concluded that supervision of school personnel is a discretionary function. See, e.g., *Reece* v. *Turner*, 284 Ga. App. 282, 286, 643 S.E.2d 814 (2007) (in Georgia, "decisions concerning the supervision of students and school personnel are considered discretionary"); *Marson* v. *Thomason*, 438 S.W.3d 292, 299 (Ky. 2014) (school principal's general supervision of employees is discretionary function). In addition, both state and federal courts that have considered the issue in a different municipal or governmental setting also have concluded that general employee supervision is a discretionary function. See *Coley* v. *Hartford*, supra, 312 Conn. 164 ("[police chief] may not be deprived of his power to exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time" [internal quotation marks omitted]); see also *Doe* v. *Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009) (hiring, supervision and training of employees are discretionary acts), cert. denied,      U.S.     , 130 S. Ct. 3497, 177 L. Ed. 2d 1089 (2010); *Burkhart* v. *Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1217 (D.C. Cir. 1997) (decisions concerning hiring, training and supervision of employees are discretionary in nature and, therefore, "immune from judicial review"); *Tonelli* v. *United States*, 60 F.3d 492, 496 (8th Cir. 1995) ("[i]ssues of employee supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception"); *Attallah* v. *United States*, 955 F.2d 776, 784 (1st Cir. 1992) ("how, and to what extent the [United States] Customs Service supervises its employees certainly involves a degree of discretion"); *West Virginia Regional Jail & Correctional Facility Authority* v. *A.B.*, 234 W. Va. 492, 514 and n.27, 766 S.E.2d 751 (2014) (citing state and federal cases holding that supervision of employees is discretionary function). We agree with the rationale expressed in the foregoing cases. Furthermore, it is axiomatic that public school administrators perform "a difficult . . . and . . . vitally important" job in our society. *Morse* v. *Frederick*, 551 U.S. 393, 409, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007). After all, they are in charge of a system that "enables our nation's youth to become responsible participants in a self-governing society." *Thomas* v. *Board of Education*, 607 F.2d 1043, 1044 (2d Cir. 1979), cert. denied sub nom. *Granville Central School District* v. *Thomas*, 444 U.S. 1081, 100 S. Ct. 1034, 62 L. Ed. 2d 765 (1980). Because of the vital importance of their function to society, school administrators undoubtedly "must be accorded

substantial discretion to oversee properly their myriad responsibilities." Id. Accordingly, we conclude that Mathieu's, McCubrey's and Sward's duty to ensure that school staff members adequately discharged their assignments was discretionary because it was encompassed within their general responsibility to manage and supervise school employees.

The plaintiff next argues that the trial court incorrectly concluded that Mathieu, McCubrey and Sward had fulfilled their ministerial duty of assigning school staff members to bus duty by actually preparing the bus duty roster. In particular, the plaintiff contends that the issue of whether a duty properly had been discharged is a question of fact that must be decided by a jury. The plaintiff further contends that there remains a genuine issue of material fact as to whether the bus duty roster was in fact created and distributed to the staff. We reject the plaintiff's arguments with respect to Mathieu, but we agree that the trial court improperly granted summary judgment with respect to McCubrey and Sward because there remains a genuine issue of material fact as to whether the bus duty roster had been created and distributed to school staff members.

The following additional legal principles inform our analysis of this claim. "Summary judgment procedure is especially ill-adapted to negligence cases . . . [when] . . . the ultimate issue in contention involves a mixed question of fact and law, and requires the trier of fact to determine whether the standard of care was met in a specific situation." (Internal quotation marks omitted.) *Michaud* v. *Gurney*, 168 Conn. 431, 434, 362 A.2d 857 (1975). We have also stated, however, that "[t]he application of the standard of care to the particular facts becomes a question of law . . . when the mind of a fair and reasonable person could reach but one conclusion . . . ." *Smith* v. *Leuthner*, 156 Conn. 422, 424–25, 242 A.2d 728 (1968).

We first address the issue of whether Mathieu's discharge of his ministerial duty can be decided as a matter of law. There can be no dispute that Mathieu had two distinct ways of discharging his ministerial duty to assign school staff members to different posts throughout the school, including the bus port; Loiselle unambiguously testified that Mathieu could either personally assume the responsibility for assigning staff membrers, or he could delegate that duty to one of the assistant principals.[22] It is also not disputed that Mathieu had, in fact, delegated that duty to McCubrey, and that McCubrey accepted the delegation and was aware of her responsibilities with respect to that duty. On the basis of this uncontroverted evidence, a fair and reasonable person could reach but one conclusion on the issue of Mathieu's duty, namely, that Mathieu, having arranged for school staff members to be assigned to their respec-

tive posts, including the bus port, discharged his ministerial duty. Accordingly, we conclude that the trial court properly determined that Mathieu had fulfilled his ministerial duty as a matter of law.

We reach a different conclusion with respect to McCubrey and Sward. Our examination of the record reveals that there is an inconsistency between McCubrey's deposition testimony and her interrogatory responses. In the latter, McCubrey stated that she had created the bus duty roster during the preceding summer, assigning approximately two weeks of bus duty to each staff member. At her deposition, however, McCubrey testified that she had prepared only outlines of the roster and not the final version of the document. Furthermore, she did not testify that she had personally distributed the bus duty roster to staff members but, rather, that she merely forwarded these outlines to Sward's office for possible tweaking. Significantly, McCubrey was unable to identify who, if anyone, had received the outlines, or what happened to them following their submission. The trial court dismissed "any expressed uncertainty" in McCubrey's testimony and relied instead on her responses to the plaintiff's interrogatories. Unlike the trial court, however, we are not prepared to disregard McCubrey's deposition testimony as immaterial. On the contrary, because she conceded that she had created a version of the bus duty roster that might not have been final, and because she could not say what happened to it following its submission to Sward's office, her deposition testimony materially undermines the apparent clarity of her interrogatory responses.[23]

Equally important, both Mathieu and McCubrey attested that the bus duty roster could not be located because "[g]enerally . . . such duty rosters are not retained after the completion of the calendar school year." The record reveals, however, that, during the school year in question, on March 19, 2008, the plaintiff filed his notice of intention to bring a civil action pursuant to § 7-465. In that notice, the plaintiff alleged, among other things, that the defendants were negligent by "[f]ailing to take precautions to ensure that students . . . did not leave the school grounds during school hours after arriving at school . . . ." This allegation provided more than sufficient notice to school administrators that they needed to preserve the potentially relevant documents, including the bus duty roster, or otherwise to identify the persons on duty on the day of the accident.

Finally, the plaintiff testified that he smoked cigarettes across from the school "[a]lmost every day" over the two weeks immediately preceding the accident, and, in his affidavit, he attested to the fact that he did not see any staff members on duty at the bus port during that time frame. In addition, Lily testified at his deposi-

tion that, on the morning of the accident, both he and the plaintiff exited the school bus, had a brief conversation at the bus port and proceeded in the direction of the crosswalk without encountering any staff member as they did so. There was no evidence submitted to the contrary that would allow an inference that the staff members were present but simply not seen by the two students. It is difficult to see how no fewer than four different staff members—two per week—all could have failed to report for bus duty for a two week period if they had been properly notified by McCubrey or Sward. Therefore, we disagree with the trial court's determination that McCubrey's responses "leave no real doubt that bus duty was actually assigned." Accordingly, with respect to McCubrey and Sward, we conclude that there remains a genuine issue of material fact as to whether the bus duty roster had been created and whether it was timely distributed to staff members. Thus, the trial court improperly granted the motion for summary judgment as to McCubrey and Sward, and the case must be remanded for further proceedings with respect to this issue.

## II

We next address the plaintiff's claim that the trial court incorrectly determined that, as a matter of law, the identifiable person-imminent harm exception to governmental immunity is inapplicable to the present case. In particular, the plaintiff contends that the trial court incorrectly concluded that he forfeited his status as a member of the identifiable class of foreseeable victims when he voluntarily left school property and was injured on a public road. The plaintiff further contends that our decision in *Haynes* v. *Middletown*, supra, 314 Conn. 303, which was issued after the trial court's decision in the present case, is at odds with the trial court's conclusion that the harm at issue was not imminent. We address each of the plaintiff's contentions in turn.

The following additional legal principles concerning the doctrine of governmental immunity guide our analysis. "The imminent harm exception to discretionary act immunity [for municipalities and their employees] applies when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . . By its own terms, this test requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. . . . We have stated previously that this exception to the general rule of governmental immunity for employees engaged in discretionary activities has received very limited recognition in this state. . . . If the plaintiffs fail to establish any one of the three prongs, this failure will be fatal to their claim that they

come within the imminent harm exception." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Violano* v. *Fernandez*, supra, 280 Conn. 329. "[T]he ultimate determination of whether [governmental] immunity applies is ordinarily a question of law for the court . . . [unless] there are unresolved factual issues material to the applicability of the defense . . . [in which case] resolution of those factual issues is properly left to the jury." (Internal quotation marks omitted.) *Haynes* v. *Middletown*, supra, 314 Conn. 313.

We note, at the outset, that the plaintiff does not challenge the trial court's determination that the board members and Loiselle were engaged in discretionary conduct. Furthermore, as we previously concluded, Mathieu, McCubrey and Sward also were engaged in discretionary conduct with the exception of their ministerial duty to assign school staff members to bus duty under the student supervision program. Therefore, the plaintiff can prevail against the defendants on his outstanding claims of negligent supervision only if he falls within the identifiable person-imminent harm exception.

A

The plaintiff first contends that the trial court incorrectly concluded that the defendants did not owe him a duty of care because he relinquished his status as a member of the identifiable class of foreseeable victims when he voluntarily left school property. According to the plaintiff, his conduct should not have affected his class status because that status attaches when school officials take custody of a student at the beginning of the school day, at which time they have a duty to protect the student from imminent harm for the remainder of the school day.[24] The plaintiff also argues that the defendants owed him a duty of supervision both on and off school grounds, namely, at the bus port and at the crosswalk where he was injured.

We conclude that, in light of the two theories of negligent supervision that the plaintiff alleges, this issue calls for a more nuanced resolution than that provided by the blanket approaches advocated by the plaintiff and the defendants. Specifically, we conclude that school officials may be held liable for injuries occurring off school property if the allegedly negligent act that proximately caused the injury occurred on school grounds when the student was under the school's supervision and control. We further conclude, however, that school officials cannot be held liable for failing to supervise a student crossing the street to leave school grounds after arriving at school in violation of a known school policy.

We have stated that "the question of whether a particular plaintiff comes within a cognizable class of foreseeable victims for purposes of this exception to qualified

immunity is ultimately a question of policy for the courts, in that it is in effect a question of duty. . . . This involves a mixture of policy considerations and evolving expectations of a maturing society . . . ." (Citation omitted; internal quotation marks omitted.) *Prescott* v. *Meriden*, 273 Conn. 759, 763–64, 873 A.2d 175 (2005). We have also stated that "this exception applies not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims." (Internal quotation marks omitted.) *Grady* v. *Somers*, 294 Conn. 324, 350–51, 984 A.2d 684 (2009). Our decisions underscore, however, that "whether the plaintiff was compelled to be at the location where the injury occurred remains a paramount consideration in determining whether the plaintiff was an identifiable person or member of a foreseeable class of victims."[25] Id., 355; see also id., 356 ("we have interpreted the identifiable person element narrowly as it pertains to an injured party's compulsion to be in the place at issue"). In fact, "[t]he only identifiable class of foreseeable victims that we have recognized . . . is that of schoolchildren attending public schools during school hours because: they were intended to be the beneficiaries of particular duties of care imposed by law on school officials; they [are] legally required to attend school rather than being there voluntarily; their parents [are] thus statutorily required to relinquish their custody to those officials during those hours; and, as a matter of policy, they traditionally require special consideration in the face of dangerous conditions." (Internal quotation marks omitted.) Id., 352.

In light of the aforementioned principles, it is inarguable that the plaintiff became a member of the identifiable class of foreseeable victims when he arrived at school on the school bus: he was a fourteen year old child enrolled in a public school, his attendance was legally required, and his parents were statutorily mandated to relinquish their protective custody to school officials. Accordingly, we agree with the plaintiff and the trial court that the school officials' duty to protect the plaintiff from imminent harm attached once he arrived at school on the day of the accident.

The trial court concluded, however, that the plaintiff relinquished his class status by voluntarily leaving school property, explaining that a school's liability is strictly limited to injuries that occur on school property. In so concluding, the trial court observed that the present case "is analogous to the line of cases that have declined to consider students attending after-school programs or activities to be within a class of identifiable victims . . . ."[26] *Strycharz* v. *Cady,* Superior Court, judicial district of New London, Docket No. KNL-CV-09-5013484-S (November 7, 2013); see, e.g., *Coe* v. *Board of Education,* 301 Conn. 112, 119, 19 A.3d 640 (2011) (upholding trial court's conclusion that student injured at middle school graduation dance held at off-school

site was not member of identifiable class of foreseeable victims because, inter alia, she was not required to be at dance); *Durrant* v. *Board of Education*, 284 Conn. 91, 96, 104, 931 A.2d 859 (2007) (holding that mother, whose six year old child was attending optional after-school day care program conducted in conjunction with public school, was not member of identifiable class of foreseeable victims when she slipped and fell because of puddle of water on school property while picking up her daughter); *Prescott* v. *Meriden*, supra, 273 Conn. 763–65 (concluding that parent injured while watching son playing in high school football game was not required to be at game and thus not class member); see also *DeConti* v. *McGlone*, 88 Conn. App. 270, 274, 869 A.2d 271 ("Connecticut courts have consistently denied relief absent a requirement that the plaintiff be present at the location where the injury occurred"), cert. denied, 273 Conn. 940, 875 A.2d 42 (2005). Although we agree with the trial court that, generally speaking, our courts have denied identifiable victim status unless the plaintiff was required to be at the location where the injury occurred, the cited cases are distinguishable because they dealt with the question of whether the plaintiffs even belonged in the class of foreseeable victims as it is defined by our case law. In the present case, however, we must determine whether, and if so, under what circumstances, the status of a plaintiff who *is* a member of that class may be altered by the plaintiff's own conduct. Under the facts of this case, we must also decide whether class membership—and consequently a school's liability—can extend beyond the limits of school property. For the reasons set forth hereinafter, we disagree with the trial court and conclude that school officials may be held liable for injuries occurring off school grounds if the officials' negligence on school property was the proximate cause of the injuries.

Under our case law, the main purpose of charging school officials with a duty of care is to ensure that schoolchildren in their custody are protected from imminent harm. See, e.g., *Haynes* v. *Middletown*, supra, 314 Conn. 315 n.6 (schools have duty to protect students from imminent harm); *Burns* v. *Board of Education*, supra, 228 Conn. 649 ("[a]t least during school hours on school days, when parents are statutorily compelled to relinquish protective custody of their children to a school board and its employees, the superintendent has the duty to protect the [students] in the board's custody from [imminent harm]"). The imposition of that duty is predicated, in part, on our settled understanding of the need "to safeguard children of tender years from their propensity to disregard dangerous conditions." (Internal quotation marks omitted.) *Ruiz* v. *Victory Properties*, *LLC*, 315 Conn. 320, 333, 107 A.3d 381 (2015); see also *Hoyem* v. *Manhattan Beach City School District*, 22 Cal. 3d 508, 520, 585 P.2d 851, 150 Cal. Rptr. 1 (1978) ("the duty to supervise school children

is imposed in large part in recognition of the fact that, without such supervision, students will not always conduct themselves in accordance with school rules or as safely as they ought to"). Accordingly, we have recognized that, when an imminent harm exists on school grounds, the school has a duty to protect children attending school from that harm. We have not yet had occasion to consider the school's duty when an imminent harm exists off school property.

We first observe that a per se rule barring liability would relieve school officials of liability even under circumstances in which school activities take place off school grounds. Thus, even if the school was exercising custody and control over schoolchildren during school hours on an educational field trip, a per se rule would preclude liability if a child was injured by an apparent and imminently harmful condition at the offsite location. Such a result is not compelled by the plain terms of the identifiable class—schoolchildren attending school during school hours—which makes no mention of school property. Such a result also would be incompatible with the rationale that led this court to designate this group as an identifiable class. Parents who have relinquished control and custody of their children to the school rightly expect that the school will exercise reasonable care, as long as their children remain under the school's custody and control.

The same logic compels the conclusion that the school is required to exercise reasonable care to prevent schoolchildren attending school during school hours from leaving school grounds when doing so would expose them to an imminent harm. For example, if the school in the present case were an elementary school, it would seem manifestly unreasonable to foreclose recovery as a matter of law if an unsupervised six year old student was allowed to wander into the intersection at issue and was struck by a car. One may conceive of similarly compelling scenarios involving older students. For example, if a high school had been informed that an active shooter situation was in progress one block away from school, it would be irrational to conclude that school officials would incur no liability if they were to release children from their custody, knowing that students would be walking directly toward the area of the shooting. Such examples, although quite different from the present case, illustrate the infirmity of a rule that automatically absolves schools of any liability merely because an accident occurs off school property. Simply put, when a jury reasonably could conclude that the potential for serious harm to a student is both apparent and great, and that danger, which lurks in close proximity to school property, results in an off-site injury, we see no reason why the doctrine of discretionary act immunity—the purpose of which is to shield municipal officers from liability in their exercise of truly discretionary judgment—

would extend to such a situation. Accordingly, we conclude that school officials may be liable for injuries that occur off school property if their negligence on school grounds during school hours was the proximate cause of the injury and the risk of harm was imminent within the meaning of *Haynes*.[27] Notably, sister state courts that have considered the issue have reached a similar conclusion. See, e.g., *Hoyem* v. *Manhattan Beach City School District*, supra, 22 Cal. 3d 515 ("when a school district fails to properly supervise a student on school premises, the district [cannot] automatically escape liability simply because the student's ultimate injury occurs off school property"); *Doe* v. *Escambia County School Board*, 599 So. 2d 226, 228 (Fla. App. 1992) (reversing judgment for defendants when questions of fact remained with regard to whether failure to supervise plaintiff on school property resulted in sexual assault off school grounds); *Brooks ex rel. Brooks* v. *Logan*, 127 Idaho 484, 489, 903 P.2d 73 (1995) (school district may be responsible for negligence during school hours that ultimately results in injury off school grounds); *Gary ex rel. Gary* v. *Meche*, 626 So. 2d 901, 902, 905 (La. App. 1993) (school board was liable for off-campus injury when school officials failed to prevent six year old plaintiff from leaving school unattended); *Jerkins ex rel. Jerkins* v. *Anderson*, 191 N.J. 285, 289–90, 922 A.2d 1279 (2007) (school may be liable for post-dismissal, off-campus injury when it failed to implement reasonable dismissal supervision policy).[28]

We reach a different conclusion insofar as the plaintiff's theory is negligent supervision at the crosswalk. The plaintiff claims that the defendants were negligent by failing to provide a crossing guard at the crosswalk situated on a public road beyond school property. Inherent in the plaintiff's theory of liability are two separate assumptions, namely, (1) that the defendants had a duty to provide supervision off school property to students en route to and from school, and (2) that this duty would also extend to a student leaving school grounds in violation of school policy.

We note that this court has had no occasion to consider whether schools have a common-law duty to ensure safe passage to and from school by providing a crossing guard at dangerous intersections or otherwise to supervise them en route.[29] We need not decide that issue in the present case, however, for several reasons. First, even if we were to conclude that such a duty exists, it is clear that the defendants in this case discharged that duty with respect to the plaintiff when he was safely delivered to school by a school bus. Second, any duty to supervise pedestrian students at a crosswalk for the purpose of ensuring safe passage to and from school cannot be said to extend to a student leaving school grounds in violation of school policy. The reasonable expectation of parents placing their children in the school's custody is that the school will make

reasonable efforts to ensure that students remain under its custody and control. Conversely, parents of high school students reasonably cannot expect the school to provide for their child's departure from school grounds during the school day and in violation of school policy. It is not difficult to imagine that escorting a student off school grounds could expose the child to dangers that equal or exceed those posed by a busy street crossing.[30] Accordingly, the plaintiff can prevail on his claim of negligent supervision only if he is able to prove that the defendants' supervision of students on school grounds was deficient and that it was a proximate cause of his injuries.

B

The plaintiff next contends that our decision in *Haynes* cannot be squared with the trial court's conclusion that the harm at issue in the present case was not imminent. Under *Haynes*, the plaintiff argues, the harm was imminent, and the school was clearly negligent. Specifically, the plaintiff argues that he adduced evidence demonstrating that (1) the intersection in question subjected students to the risk of being hit by a vehicle, (2) the defendants knew about that risk, and (3) despite their knowledge, the defendants failed to provide adequate supervision of the students at the bus port. The plaintiff further argues that, as in *Haynes*, this evidence is sufficient to permit a finding that the dangerous intersection, coupled with the defendants' failure to adequately supervise the students at the bus port, subjected him to imminent harm. The defendants counter that *Haynes* is distinguishable from the present case because, in contrast to the plaintiff in *Haynes*, the plaintiff in the present case failed to establish that any allegedly imminent harm was apparent to the defendants. Specifically, the defendants argue that the plaintiff presented no evidence that the defendants were aware that students arriving by bus were leaving school grounds before the start of school.

As we previously noted, one of the reasons for the trial court's conclusion that the identifiable person-imminent harm exception did not apply to the present case was its determination that the risk of harm was not imminent. In evaluating the risk of harm, the trial court relied on the principles that governed the doctrine of imminent harm at that time. See, e.g., *Purzycki* v. *Fairfield*, 244 Conn. 101, 110, 708 A.2d 937 (1998) (concluding that second grade student's unsupervised use of school hallway during recess constituted imminent harm because it was limited to specific time period and geographical area, namely, "the one-half hour interval when . . . students were dismissed from the lunchroom to traverse [unsupervised school hallways]"), overruled in part by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014). Following the trial court's decision and during the pendency of the present appeal,

however, we reexamined the imminent harm doctrine in *Haynes*. For that reason, a closer review of that case is necessary.

In *Haynes*, the plaintiff Jasmon Vereen, a high school student, was injured while changing in the locker room following his physical education class. *Haynes* v. *Middletown*, supra, 314 Conn. 308. Although the students had been informed by the school that horseplay in the locker room was not permitted, Vereen and other students were engaged in such horseplay at the time. Id. One of the students pushed Vereen into a locker that had an exposed jagged and rusted edge, and Vereen suffered a cut that left a scar. Id. The evidence established that the locker had been in a state of disrepair for approximately seven months. Id., 308, 325. The evidence also demonstrated that school officials knew that the locker was in a state of disrepair and that horseplay in the locker rooms was an ongoing problem. Id., 325. In the ensuing action, Vereen alleged that the defendant, the city of Middletown (city), and its agents or employees were negligent. Id., 308. The city contended that maintenance of the locker was a discretionary duty not governed by any municipal policy or procedure, thereby shielding it from liability. See id., 308–309. At trial, Vereen conceded that the city's acts were discretionary but argued that the identifiable person-imminent harm exception applied "because the condition of the locker presented an imminent harm" to students in the locker room. Id., 309. The trial court concluded that the defective locker did not pose a risk of imminent harm and rendered judgment in favor of the city.[31] The Appellate Court subsequently affirmed the trial court's judgment. *Haynes* v. *Middletown*, 142 Conn. App. 720, 737, 66 A.3d 899 (2013).

On appeal to this court, we revisited and clarified the then existing principle of imminent harm. In particular, we examined our decision in *Evon* v. *Andrews*, supra, 211 Conn. 501, in which we explained that a harm is not imminent if it "could have occurred at any future time or not at all."[32] Id., 508. In light of *Evon*, we concluded that a harm is not imminent unless it is "so likely to happen that it gives rise to a clear duty to correct the dangerous condition creating the risk of harm immediately upon discovering it . . . ." *Haynes* v. *Middletown*, supra, 314 Conn. 317. We emphasized that this interpretation of *Evon* is consistent both with the meaning of the word imminent, that is, "ready to take place";[33] (internal quotation marks omitted) id., 318; and "with our case law holding that the imminent harm to identifiable persons exception represents a situation in which the public official's duty to act is [so] clear and unequivocal that the policy rationale underlying discretionary act immunity—to encourage municipal officers to exercise judgment—has no force." (Internal quotation marks omitted.) Id.

Although this court appeared to narrow the definition of imminent harm in *Burns* v. *Board of Education*, supra, 228 Conn. 650, which applied "to harms arising from dangerous conditions that are temporary, if the risk of harm is significant and foreseeable"; (emphasis omitted) *Haynes* v. *Middletown*, supra, 314 Conn. 319; we rejected the temporariness requirement in *Haynes*, overruling *Burns* in part and noting that *Evon* did not stand for the proposition that "imminent harms are harms that can . . . happen [only] in the immediate future because they arise from temporary conditions."[34] Id., 320. In doing so, we expressly observed that our statement in *Evon* "that a harm is not imminent if it could have occurred at any future time or not at all was not focused on the *duration* of the alleged dangerous condition . . . but on the *magnitude of the risk* that the condition created." (Emphasis in original; internal quotation marks omitted.) Id., 322. Thus, in accordance with the implicit rationale of *Evon*, we concluded that "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm."[35] Id., 322–23.

Applying that clarified standard to the facts in *Haynes*, we first held that, because the jury reasonably could infer that school officials knew that the locker had been broken for seven months, and because school officials also knew that, despite the written warning provided to students at the beginning of the school year, horseplay was an ongoing problem in the locker room, a jury reasonably could have inferred "that the dangerous condition was apparent to school officials." Id., 325. We further held that, although the evidence in that case was "far from compelling, we [nevertheless were] unable to conclude that no reasonable juror could find that it was apparent to school officials that, in combination, the ongoing problem of horseplay in the locker room and the presence of the broken locker were so likely to cause an injury to a student that the officials had a clear and unequivocal duty to act immediately to prevent the harm either by supervising the students while they were in the locker room to prevent horseplay or by fixing the broken locker." Id. Accordingly, we reversed the judgment of the Appellate Court and remanded the case to that court with direction to remand the case to the trial court for a new trial. Id., 331.

In the present case, there is abundant evidence that the defendants were concerned about the safety of students using the crosswalk to walk to and from school. But the safety of the students crossing before and after school, in accordance with school policy, is not at issue in this case. The issue in this case is whether there is sufficient evidence for a jury reasonably to conclude

that the school was aware that students were crossing Norwich Avenue *in violation of school policy after getting off the bus* on school property and before the start of the school day. There is no such evidence. Indeed, all of the defendants who were deposed testified that they had no such knowledge. For example, Mathieu, the principal, testified that, prior to the plaintiff's accident, Mathieu had no knowledge from "any source whatsoever" that students were leaving school grounds before the start of school. Indeed, Mathieu stated that he never even considered the possibility of this occurring because, if a student were caught, it would result in his or her suspension from school.

Of course, the plaintiff was not required to prove actual knowledge on the part of the defendants. As we have stated previously, the applicable test for the apparentness prong of the identifiable person-imminent harm exception is an objective one, "pursuant to which we consider the information available to the [school official] at the time of [his or] her discretionary act or omission." *Edgerton* v. *Clinton*, 311 Conn. 217, 231, 86 A.3d 437 (2014). Under that standard, "[w]e do not ask whether the [school official] actually knew that harm was imminent but, rather, whether the circumstances would have made it apparent to a reasonable [school official] that harm was imminent." Id., 231 n.14. Nonetheless, the plaintiff does not identify any facts in the record that would have made it apparent to the defendants that students arriving by bus were crossing Norwich Avenue before the start of school. Admittedly, the plaintiff claims that he himself did so "almost every day" during the first two weeks of school, and that he observed "many" students doing the same. The plaintiff's testimony, however, is insufficient to create a genuine issue of material fact with respect to this issue. As a practical matter, "many" could be five or it could be twenty-five; we simply have no way of knowing and, therefore, no way of knowing whether, on the basis of the sheer magnitude of the problem, it is reasonable to impute knowledge of it to the defendants. The same logic holds for the plaintiff's assertion that the other side of Norwich Avenue was "a common area for student[s] to smoke" or Lily's deposition testimony that crossing the street to smoke before school "was just a normal thing [to do] . . . ." Furthermore, even if we knew the exact number of students who were arriving by bus and then walking across the street, there is nothing in the record to indicate that the defendants would have seen them doing it. To the contrary, the evidence in the record indicates that school personnel were contractually required to be at work by 7:15 a.m., prior to the arrival of the first school bus. We cannot assume, therefore, that staff members would have driven by these students on their way to work. Nor is there any evidence in the record that they would have seen them from their offices or classrooms if they hap-

pened to look out the window at an opportune moment. Even if, as Mathieu claims, there were faculty members assigned to the bus port every morning, it is unclear from the record that those faculty members would have seen a small number of students, amidst the approximately 1000 students arriving in a fifteen minute time frame, slipping into the parking lot and across Norwich Avenue. The plaintiff, for his part, denies that faculty members who might have seen him were even present at the bus port during the period in question.

The plaintiff argues that "[t]he thrust of [his claim] is that if school personnel had performed their duties, upon his arrival at school, [he] would have been safely inside the school building each morning. Instead, he crossed Norwich Avenue each morning to smoke . . . ." Whether school personnel could have prevented the plaintiff from leaving school property, however, although certainly relevant to the plaintiff's breach of a ministerial duty claim, is simply irrelevant to the issue of whether it was *apparent* to them that students were, in fact, leaving school property, which is what the plaintiff must demonstrate to establish the applicability of the identifiable person-imminent harm exception to governmental immunity. Because we are unable to conclude, on the basis of the record before us, that a reasonable juror could find that the circumstances were such that the defendants would have been aware of this problem, the defendants are entitled to judgment as a matter of law on this claim.[36]

The judgment is reversed with respect to the granting of the motion for summary judgment in favor of McCubrey and Sward and the case is remanded for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion ROGERS, C. J., and ZARELLA, McDONALD, ESPINOSA and ROBINSON, Js., concurred.

[1] The plaintiff Kiersten Strycharz commenced this action as next friend and parent of her then minor son, the named plaintiff, Joseph Strycharz. She did not raise any claims in her individual capacity. For ease of reference, we hereinafter refer to Joseph Strycharz as the plaintiff throughout this opinion.

[2] The plaintiff also asserted claims against Richard D. Cady, the driver of the vehicle that struck him, Gregory Plunkett, the town's director of facilities and operations, and the town for Plunkett's alleged negligence and the alleged negligence of certain unnamed personnel assigned to bus duty at the school on the morning of the accident. The latter three claims were added by way of an amended complaint that was filed after the defendants filed their motion for summary judgment. With respect to Cady, the trial court granted the plaintiff's motion for a judgment of default and rendered judgment thereon. The claims against Plunkett and the town for the alleged negligence of Plunkett and other unnamed individuals remain pending in the trial court and are not at issue in the present appeal. We note that, despite the fact that certain claims remain pending against the town, we treat this appeal as to the counts against the town as one from a final judgment because those claims are derivative of claims against individuals for whom there are no pending claims.

[3] General Statutes (Rev. to 2007) § 7-465 provides in relevant part: "(a) Any town, city or borough, notwithstanding any inconsistent provision of law, general, special or local, shall pay on behalf of any employee of such

municipality . . . all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded . . . for physical damages to person or property . . . if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment . . . .”

Hereinafter, all references to § 7-465 are to the 2007 revision.

[4] As we explain more fully hereinafter, governmental immunity protects municipalities and their employees from liability for negligence when the negligent acts are discretionary in nature. An exception to governmental immunity for discretionary acts pertains to circumstances in which an identifiable victim faces imminent harm if no action is taken. Governmental immunity also does not shield municipalities and their employees from liability if the negligent acts are ministerial in nature.

[5] The plaintiff appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] The area also had “[a]n existing ‘School Speed Limit 30 When Flashing’ zone,” with just two school zone signs governing a stretch of Norwich Avenue that actually included two schools separated by one-half mile. The town expressed concern about the situation because persons driving there, having passed one of the schools, might well assume that the school zone had ended and resume their higher speed.

[7] The first school bus arrived at the school at 7:15 a.m., and school started at 7:35 a.m.

[8] Under the terms of their contract, the teachers were required to arrive at school by 7:15 a.m.

[9] At her deposition, Loiselle testified without contradiction that Mathieu had the authority to delegate that duty to either McCubrey or Sward.

[10] In addition to providing a physical copy of the roster to the staff at the beginning of the school year, the administrators would also issue a reminder at the beginning or the end of each week, informing the assigned staff members about their upcoming duty schedule.

[11] Although Sward was also deposed, the record does not contain his testimony concerning this issue.

[12] The following colloquy took place during McCubrey’s deposition:

“[The Plaintiff’s Counsel]: Now, you had mentioned earlier that this roster, because of your surgery, you had handed it off to someone, but you don’t recall who it was?

“[McCubrey]: Right.

“[The Plaintiff’s Counsel]: Do you know if the roster was essentially implemented after you gave this roster to this person?

“[McCubrey]: Yes.

“[The Plaintiff’s Counsel]: And how do you know that?

“[McCubrey]: Because I would have made sure that everything was set for the beginning of [the] school [year].”

[13] The plaintiff smoked on the other side of Norwich Avenue because smoking on school property was a violation of school policy that could result in suspension or expulsion.

[14] General Statutes (Rev. to 2007) § 10-220 provides in relevant part: “(a) Each local or regional board of education shall maintain good public elementary and secondary schools, implement the educational interests of the state . . . and . . . shall provide an appropriate learning environment for its students which includes . . . (4) a safe school setting . . . .”

Hereinafter, all references to § 10-220 are to the 2007 revision.

[15] We note that neither the plaintiff’s complaint nor any pleadings or documents filed with the trial court provide the text of policy 5142 (a) of the School Policies and Regulations. Pursuant to General Statutes § 52-163, however, we take judicial notice of that regulation.

Policy 5142 (a) of the School Policies and Regulations provides in relevant part: “The Superintendent of Schools shall implement rules and regulations governing student safety. These rules and regulations shall include the following points:

“1. Regular inspection of school grounds and buildings for safety hazards.

“2. Establishment of safety rules and regulations.

“3. Involvement of all students and school personnel accountable for safety. . . .”

[16] The plaintiff also asserted corresponding direct liability claims against the town pursuant to General Statutes § 52-557n (a) (1). These claims are not at issue in this appeal, however, because the trial court did not rule on

all of the plaintiff's direct liability claims against the town.

[17] General Statutes § 52-557n provides in relevant part: "(a) (1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to persons or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law. . . ."

[18] The trial court also observed that, even if mere delegation of the duty to McCubrey was not enough to satisfy Mathieu's duty, there was "no genuine issue of material fact as to whether the [bus] duty roster was actually created, notwithstanding the disappearance of the roster itself." The court further reasoned that, once the bus duty roster had been completed, and the staff members were assigned their duty periods, Mathieu had discharged his responsibility. For the reasons set forth hereinafter, we do not agree with this reasoning of the trial court. We do agree, however, that Mathieu discharged his ministerial duty by delegating it to McCubrey.

[19] The trial court further concluded that, because it had already determined that the identifiable person-imminent harm exception did not apply in this case, the plaintiff could not prevail on his claim that Mathieu, McCubrey and Sward were negligent in their supervision of school staff members.

[20] In *Haynes*, this court reexamined and modified the imminent harm analysis. Specifically, we held that "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm." *Haynes* v. *Middletown*, supra, 314 Conn. 322–23.

[21] We note, preliminarily, that "[o]ur standard of review of a trial court's granting of summary judgment is well established. Pursuant to Practice Book § 17-49, summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Such questions of law are subject to plenary appellate review. . . . The test is whether a party would be entitled to a directed verdict on the same facts." (Citation omitted; internal quotation marks omitted.) *Niehaus* v. *Cowles Business Media, Inc.*, 263 Conn. 178, 188, 819 A.2d 765 (2003). Furthermore, "[t]he issue of governmental immunity is simply a question of the existence of a duty of care, and this court has approved the practice of deciding the issue of governmental immunity as a matter of law." (Internal quotation marks omitted.) *Doe* v. *Petersen*, 279 Conn. 607, 613, 903 A.2d 191 (2006). In addition, although this appeal concerns only the plaintiff's claims against the municipal employees under the common law and against the town under § 7-465, not § 52-557n (a), "this court has recognized that the common-law exceptions to liability for municipal employees are codified under § 52-557n (a)" and that "the analysis is the same." *Bonington* v. *Westport*, 297 Conn. 297, 307 n.8, 999 A.2d 700 (2010).

[22] Common sense dictates that, even in the absence of an explicit directive or authorization by a superior, school principals must have the authority to delegate some of their powers and responsibilities to subordinates. To conclude otherwise would place an undue burden on the principal, one that would make it impossible for him or her to do that job.

[23] We further note that, in light of McCubrey's testimony conceding her lack of actual knowledge as to what happened to the outlines after she forwarded them to Sward's office, her assertion that the bus duty roster had been distributed because she "would have made sure that everything was set for the beginning of school" is not conclusive, particularly because neither the roster nor the outline has ever been located, the plaintiff presented evidence indicating that there was no staff supervision at the bus port for at least the first two weeks of school, and the persons purportedly assigned to bus duty for that time period have not been identified.

[24] The plaintiff also argues that there is no precedent in this state for considering the plaintiff's conduct in determining class status, and that his conduct is more appropriately analyzed in the context of contributory negligence.

[25] As we explain hereinafter, it is equally significant if the plaintiff is compelled to be at the place where the breach of the duty of care occurred.

[26] The trial court quoted *Burns* v. *Board of Education*, supra, 228 Conn.

650, for the proposition that one of the reasons for considering public school students as an identifiable class of foreseeable victims is that they are "compelled by statute to be on . . . school grounds" where the injury occurred. (Emphasis omitted.) Although we agree that the fact that the injury in *Burns* occurred on school grounds was one of the factors relevant to our determination that the plaintiff in that case was a member of the class, we do not agree with the trial court's conclusion that that fact was a necessary prerequisite to the identifiable class determination in *Burns* because the place of injury was not at issue in that case, and, consequently, we were not required to decide whether an injury occurring off school property would have made a difference.

[27] We emphasize that our conclusion does not relieve a plaintiff of the burden of proving that, immediately prior to the accident, he or she belonged to the identifiable class of foreseeable victims and, therefore, was owed a duty of care by the defendant. We further emphasize that the plaintiff's conduct in voluntarily leaving school property in direct violation of a known school policy properly may be considered by the fact finder in assessing the issue of comparative negligence.

[28] We underscore, however, that courts, in considering whether the supervision was reasonable, have universally recognized that the degree and nature of supervision is dependent on the age of the child and the nature of the dangerous condition. See, e.g., *Haynes* v. *Middletown*, supra, 314 Conn. 315 n.7 (determination of whether harm is imminent should include "characteristics of the persons who are likely to be exposed to it"); see also *Bryant* v. *United States*, 565 F.2d 650, 653 (10th Cir. 1977) ("[c]onduct that might easily qualify as ordinary and prudent care to a child of one age, and with capacity to understand and appreciate danger, might easily fall short of such classification with reference to a child of more tender years and of less understanding and appreciation of danger").

[29] Our sister states that have considered the issue uniformly have declined to impose such a duty, holding that schools are not responsible for the supervision of students off school grounds—including pedestrian students en route to and from school—in the absence of a statutory mandate or an assumption of that responsibility on the part of the school. See, e.g., *Monroe* v. *Basis School, Inc.*, 234 Ariz. 155, 158, 318 P.3d 871 (App. 2014) ("a school has no affirmative, [common-law] duty to provide school crossing guards"); *Gilbert* v. *Sacramento Unified School District*, 258 Cal. App. 2d 505, 508, 65 Cal. Rptr. 913 (1968) (no duty to supervise students going to or from school in absence of statutory mandate or assumption of duty); *Kerwin* v. *San Mateo*, 176 Cal. App. 2d 304, 307, 1 Cal. Rptr. 437 (1959) ("[a] school district is under no duty to supervise, or provide for the protection of its [students], on their way home"); *Rife* v. *Long*, 127 Idaho 841, 847, 908 P.2d 143 (1995) (no common-law duty of care when students have been released and parents are free to resume control over their children); *Honeycutt ex rel. Phillips* v. *Wichita*, 251 Kan. 451, 469–70, 836 P.2d 1128 (1992) (school district has no duty to supervise students who are off school grounds and on their way home unless it has undertaken that duty); *Davis* v. *Lutheran South High School Assn.*, 200 S.W.3d 163, 168–69 (Mo. App. 2006) (no duty of care when school has no physical custody of students); *Young ex rel. Young* v. *Salt Lake City School District*, 52 P.3d 1230, 1233–34 (Utah 2002) (no affirmative common-law duty to provide crossing guard). We also note that our sister jurisdictions, in declining to impose the duty, reason that, because the school's duty is "coextensive with and concomitant to its physical custody of and control over the child, [that duty must cease when] the child has passed out of the orbit of [the school's] authority in such a way that the parent is perfectly free to reassume control over the child's protection . . . ." *Pratt ex rel. Pratt* v. *Robinson*, 39 N.Y.2d 554, 560, 349 N.E.2d 849, 384 N.Y.S.2d 749 (1976); see also *Rife* v. *Long*, supra, 847 ("[T]he [common-law] duty [arises] because the parents are not in a position to protect their children while [the children] are attending school. . . . However, after school has adjourned for the day, and the students have been released, the parents are free to resume control over the child's well-being.").

[30] We also note that it is far from obvious that a crossing guard at the intersection would have been able to prevent the accident in this case. As an employee of the school, a crossing guard could be required to inquire whether students who are attempting to leave school premises have permission to do so. As a result, students without permission would likely find another place to cross the street where their infraction would not be detected and potentially reported. See, e.g., *Dalton* v. *Memminger*, 67 App. Div. 3d 1350, 1350, 889 N.Y.S.2d 785 (2009) (despite existence of crossing guard at

intersection, student was struck by car after leaving school grounds to smoke cigarette when she crossed highway short distance from intersection where crossing guard was posted).

[31] Although the jury in *Haynes* returned a verdict in favor of Vereen, the trial court granted the city's motion to set aside that verdict and rendered judgment for the city. *Haynes* v. *Middletown*, supra, 314 Conn. 310.

[32] In *Evon*, "the plaintiffs alleged that their decedents had been killed when a fire destroyed their residence. They claimed that the city of Waterbury and its officers had been negligent in failing properly to enforce various statutes, regulations and codes concerning the maintenance of rental dwellings . . . and that this negligence had subjected readily identifiable persons—the decedents—to imminent harm. . . . This court concluded that [t]he risk of fire implicates a wide range of factors that can occur, if at all, at some unspecified time in the future." (Citations omitted; internal quotation marks omitted.) *Haynes* v. *Middletown*, supra, 314 Conn. 317.

[33] See, e.g., Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 621 (defining "imminent" as, inter alia, "hanging threateningly over one's head").

[34] We also rejected the foreseeability standard articulated in *Burns* because it did not rise to the level of "the demanding imminent harm standard . . . ." *Haynes* v. *Middletown*, supra, 314 Conn. 321.

[35] We further emphasized that, because "[a] condition that is not an imminent harm in one context may be an imminent harm in another context," the determination of whether a harm is imminent should include an examination of all facts and circumstances surrounding the dangerous condition, "including the characteristics of the persons who are likely to be exposed to it." *Haynes* v. *Middletown*, supra, 314 Conn. 315 n.7; see also *Bryant* v. *United States*, 565 F.2d 650, 653 (10th Cir. 1977) ("[c]onduct that might easily qualify as ordinary and prudent care to a child of one age, and with capacity to understand and appreciate danger, might easily fall short of such classification with reference to a child of more tender years and of less understanding and appreciation of danger").

[36] In his concurring and dissenting opinion, Justice Eveleigh maintains that, to satisfy the apparentness prong of the identifiable person-imminent harm exception to governmental immunity, the plaintiff need only demonstrate that the defendants were aware that "students arriving by bus would be in danger if not properly supervised after arriving at school." Our case law makes clear, however, that a plaintiff seeking to invoke that exception must demonstrate that the defendants were aware of the specific danger alleged to have caused the plaintiff's injuries. That danger in the present case, as alleged throughout the plaintiff's complaint, was "that . . . students regularly left school grounds and crossed Norwich Avenue . . . rather than entering the school building immediately upon arrival [at] school." For the reasons previously set forth, we conclude that the plaintiff has failed to demonstrate that a jury reasonably could infer that it was apparent to the defendants that students were engaged in this type of behavior prior to the start of school.

Justice Eveleigh also asserts that, because, during the pendency of this appeal, this court modified the legal standard for determining whether a particular harm was imminent; see *Haynes* v. *Middletown*, supra, 314 Conn. 322–23; we should remand the case to the trial court for application of the correct legal standard. Specifically, Justice Eveleigh maintains that "any insufficiency in proof by the plaintiff [may have been] caused by the subsequent change in the law," and "he should be given [a] chance to [present] evidence in light of the new legal standard." Our decision, however, does not rest on the plaintiff's failure to satisfy the imminency prong of the identifiable person-imminent harm exception but, rather, on his failure to satisfy the *apparentness* prong of the exception, the requirements of which have not changed since the commencement of this action.