******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

JOHN DOE *v.* TOWN OF MADISON
(SC 20508)

JOHN DOE *v.* TOWN OF MADISON ET AL.
(SC 20509)
(SC 20510)

Robinson, C. J., and McDonald, D'Auria, Mullins, Ecker and Keller, Js.

*Syllabus*

The plaintiffs, X, Y and Z, three former high school students, sought to recover damages from the defendant town, its board of education, and the town high school principal, S, for injuries the plaintiffs allegedly sustained as a result of sexual abuse by A, a teacher at the high school. A was acquainted with the plaintiffs through her roles as an English teacher, faculty yearbook advisor, and conditioning coach for the high school football team, of which the plaintiffs were members. At various points, A started exchanging messages with each of the plaintiffs on a social networking platform. A's messages initially concerned school, athletics, and the yearbook, but the messages progressed to include personal topics, such as A's marital problems with her husband, R, who also was employed as a teacher at the high school, and sexually suggestive photographs and banter containing sexual overtones. A had summoned X to her classroom more than twenty times, and she had called Y and Z to her classroom approximately five times each. To avoid detection, A varied the days and times at which she summoned the plaintiffs and often used an issue related to the yearbook as a pretext for the meetings. On one of those occasions, A performed fellatio on Y. She also touched Z in an inappropriate manner several times. Although A had a good reputation and strong performance evaluations, her attire at summer football practices, specifically, tight fitting shorts and only a sports bra for a top, attracted the coaches' attention. Additionally, R took issue with A's attire and what he believed to be her flirtatious, attention seeking behavior. R was concerned that a rumor had spread among the teachers that A had been flirting with X, and he confronted A about her social media contact and one-on-one meetings with X, as well as certain flirtatious behavior he witnessed A displaying toward players at a Friday night football game. The plaintiffs alleged, inter alia, that the defendants were negligent in supervising A and in failing to train school employees to identify and report inappropriate relationships between teachers and students. Various teachers and coaches, including C, the high school's athletic director, were deposed during discovery. C testified that he expected his subordinates to enforce certain standards of professionalism, including requiring any coach to cover up if shirtless. The defendants thereafter filed motions for summary judgment, claiming that the plaintiffs could not establish negligence or causation and that the defendants were entitled to governmental immunity. The trial court granted the defendants' motions, concluding that, although the defendants had a ministerial duty to report abuse or an imminent risk of serious harm pursuant to the mandatory reporting statute (§ 17a-101a) and the reporting policy set forth in the board of education policies and bylaws, there was no evidence that any of the school employees had reasonable cause to suspect that A was sexually abusing the plaintiffs. The court also concluded that the identifiable persons subject to imminent harm exception to discretionary act immunity did not apply. The trial court rendered judgments for the defendants, and the plaintiffs appealed. *Held*:

1. The trial court correctly concluded that no genuine issue of material fact existed as to whether the defendants breached their ministerial duty to report a reasonable suspicion of child abuse, as imposed by the mandatory reporting statute and the board of education reporting policy: in view of the totality of the circumstances, the school faculty and the coaching staff did not have reasonable cause to suspect that A was sexually abusing the plaintiffs or exposing them to an imminent risk of sexual abuse, as A had an unblemished personnel record and was held

in uniformly high regard by her colleagues and students at the high school, she was known to handle student crushes appropriately by politely rebuffing them, and none of the teachers or coaches who testified ever witnessed A flirting with any of the plaintiffs or any other student; moreover, the plaintiffs' repeated visits to A's classroom did not appear unusual to other faculty members in light of A's role as a yearbook advisor, the measures A took to avoid detection, and the common practice of students visiting other teachers' classrooms; furthermore, even if A's attire during football practices was inappropriate, there was no evidence that A ever exhibited nudity or that her attire indicated that she was inclined to engage in sexual impropriety with students, and any flirtatious behavior A may have displayed at the football game was too far removed from any type or instance of sexual abuse to supply reasonable cause to suspect an imminent risk of such abuse.

2. Y could not prevail on his claim that C's testimony established a ministerial duty of professionalism and that there was a genuine issue of material fact with respect to whether the failure of staff members, including coaches, to address the issue of A's attire during football practices constituted a breach of that duty: S testified that the school had no dress code, and there was no evidence that C's views of professionalism as they related to attire ever were communicated to school employees in a manner that clearly established a duty to dress in a prescribed way, without the exercise of judgment or discretion; accordingly, C's testimony concerning his expectations of his subordinates and his opinion of what constituted professionalism, standing alone, was not sufficiently definite to establish an enforceable ministerial duty of professionalism, and the trial court properly granted summary judgment with respect to this issue.

3. There was no merit to Y and Z's claim that the trial court incorrectly determined that the imminent harm to identifiable persons exception to governmental immunity did not apply in the present case, as it would not have been apparent to a reasonable school official that the defendants' acts and omissions were so likely to cause harm that a clear and unequivocal duty to act immediately to prevent such harm was created: the evidence suggested that A's conduct, and particularly her sexual assaults of Y and Z, were the culmination of a generally clandestine pattern of behavior, and, although some might have viewed her attire at football practices as inappropriate for an educational setting, there was nothing to suggest that anyone would reasonably anticipate that a sexual assault of a student would be the immediate result of that attire, especially in light of A's otherwise unblemished record and the uniformly high regard her students and colleagues had for her; moreover, there was no evidence that the plaintiffs' repeated visits to A's classroom were abnormalities that should have been apparent to staff members, as it was undisputed that students routinely visited teachers' classrooms at numerous times for legitimate pedagogical or extracurricular reasons, and A took measures to avoid raising any suspicion; furthermore, R's negative response to A's interaction with the players at the Friday night football game did not evince a belief that A was imminently about to engage in an inappropriate sexual relationship with any student, let alone one of the plaintiffs.

4. The trial court properly granted the town's motion for summary judgment with respect to Z's claim that the town was liable for the failure of its police officer, who was assigned to the high school as a resource officer, to monitor the school's security camera footage, which Z claimed would have shown him entering A's classroom, as Z did not establish that the defendants had a ministerial duty to monitor the security camera footage; S's testimony that, although the police had access to the security footage, the footage was not regularly monitored and reviewed only when an incident was reported demonstrated that there was no policy governing the manner and frequency with which security cameras and their footage were monitored, and, accordingly, the failure of the school resource officer to monitor the security cameras was a discretionary act subject to governmental immunity.

Argued January 20—officially released July 30, 2021*

*Procedural History*

Three actions to recover damages for, inter alia, the alleged negligence of the named defendant et al., and

for other relief, brought to the Superior Court in the judicial district of New Haven, where, in the first case, the court, *Agati, J.*, granted the plaintiff's motion to add the named defendant's Board of Education as a defendant; thereafter, the court, *Abrams, J.*, granted the motions to consolidate filed by the named defendant et al. and consolidated the three cases; subsequently, the actions in the first and second cases were withdrawn as to the named defendant; thereafter, the court, *Abrams, J.*, granted the motions for summary judgment filed by the named defendant et al. and rendered judgments thereon, from which the plaintiffs filed separate appeals. *Affirmed.*

*James M. Harrington*, for the appellant in Docket No. SC 20508 (plaintiff John Doe I).

*Matthew D. Popilowski*, with whom, on the brief, was *Brendan J. Keefe*, for the appellant in Docket No. SC 20509 (plaintiff John Doe II).

*William B. Bilcheck, Jr.*, for the appellant in Docket No. SC 20510 (plaintiff John Doe III).

*Catherine S. Nietzel*, with whom, on the brief, was *Jonathan C. Zellner*, for the appellees (named defendant et al.).

*Opinion*

ROBINSON, C. J. These appeals present several issues of governmental immunity under General Statutes § 52-557n arising from the sexual abuse of the plaintiffs, John Doe I, John Doe II and John Doe III,[1] by Allison Marchese (Allison), who was an English teacher at their high school, the Daniel Hand High School (high school) in Madison. The plaintiffs appeal[2] from the judgments of the trial court granting the motions for summary judgment filed by the defendants, the town of Madison (town), the Board of Education of the Town of Madison (board), and Anthony Salutari, Jr., the principal of the high school,[3] on the ground of governmental immunity. On appeal, the plaintiffs claim that the trial court incorrectly concluded that (1) there was no genuine issue of material fact with respect to whether the teachers and football coaching staff at the high school had reasonable cause to believe that Allison was sexually abusing the plaintiffs, which would have triggered their ministerial duty to report suspected child abuse under No. 5120.4.2.5 of the board's policies and bylaws (board reporting policy) and the mandatory reporting statutes, General Statutes §§ 17a-101[4] and 17a-101a,[5] (2) the testimony of Craig Semple, the high school's athletic director, did not establish a ministerial duty of professionalism, (3) they were not identifiable persons subject to imminent harm for purposes of that exception to discretionary act immunity under § 52-557n (a) (2) (B), and (4) John Doe III did not plead or establish a ministerial duty on the part of the town's police officers, one of whom was assigned as the high school's school resource officer, to monitor the high school's security camera footage. We disagree with the plaintiffs' claims and affirm the judgments of the trial court.

The record reveals the following facts, which we view in the light most favorable to the nonmoving plaintiffs, along with the procedural history of these cases. In the spring of 2014, when the events giving rise to this appeal began, the three plaintiffs were students at the high school, where they were members of the football team. At that time, John Doe I was a fourteen year old freshman, John Doe II was a seventeen year old junior, and John Doe III was a fifteen year old sophomore. In addition to her duties as an English teacher, Allison also served as the high school's faculty yearbook advisor and as a core conditioning coach for the football team. Until the events leading to this appeal, she had an excellent reputation in the school and the community, with strong performance evaluations and "a sterling disciplinary record . . . ." Allison's husband, Robert Marchese (Robert), was also employed at the high school as an English teacher and the head of the English department.

Allison first met John Doe I in the spring of 2014,

when he was a student in her freshman literature class. John Doe I, who had a reputation for being unusually bold and mature for a freshman,[6] bantered with Allison during class. Although she did not banter or flirt back with John Doe I publicly, they later developed a relationship through one-on-one meetings in school and messaging through various social media platforms, including Instagram. The messaging began when John Doe I messaged Allison through Instagram, initially about a book; the correspondence then progressed to more private and sexual topics. The messaging continued into the summer until John Doe I left for a family vacation to Africa; he asked her not to contact him during the summer. Over the rest of that summer and into the fall of 2014, however, Allison pursued John Doe I by paying special attention to him at football practices, summoning him to her classroom approximately twenty to thirty times, sending him a bagel with a note while he was in another class, and sending him dozens of sexually explicit online messages and photographs through social media platforms, including Instagram. Around this time, Robert learned that Allison and John Doe I had connected on Instagram when John Doe I began to follow her profile; he confronted Allison multiple times about this connection and their one-on-one meetings, as well as rumors that Robert believed had spread among the teachers that Allison had been flirting with John Doe I.[7] There is no evidence, however, that Robert was aware of the content of Allison's private Instagram messages. Although John Doe I tried to end his contacts with Allison, she persisted in sending him messages through the fall of 2014, continuing until her arrest on January 7, 2015, for charges arising from the sexual assault of John Doe II, which we will discuss subsequently.

Around the same time, Allison attempted to develop her relationship with John Doe I by initiating a similar online relationship on Instagram with John Doe III, who was John Doe I's best friend. John Doe III initially went to Allison's classroom a few weeks into the 2014–2015 school year at the request of John Doe I to try to resolve the tension that had developed between Allison and John Doe I by the end of the summer, as John Doe I had tired of their communications and did not want to speak with her any more. Thereafter, Allison called John Doe III to her classroom approximately six times during school hours, summoning him from multiple classes, for conversations about her private life, her marriage, and her fantasies. She also asked John Doe III to relay messages to John Doe I. During several of those classroom visits, Allison touched John Doe III inappropriately by hugging him tightly in a way that put her breasts in close proximity to his face.

During the summer of 2014, Allison also became acquainted with John Doe II, first in her capacity as a core conditioning coach for the high school's football

team, and later as the faculty yearbook advisor. John Doe II learned that Allison and John Doe I were exchanging messages on Instagram after he asked John Doe I several times about the special attention that she was giving him during football practices and conditioning sessions. John Doe II did not think that anyone else at practices, including players or coaches, had noticed these interactions. During a subsequent conversation after summer conditioning practice had ended, John Doe I showed John Doe II the various Instagram messages between John Doe I and Allison, which John Doe II described as "creepy" and akin to what a "high school girl" would send a "high school guy . . . ."

In the fall of 2014, John Doe II and Allison also worked together in the school gym, which she helped to manage, and where he went on a daily basis in order to stay conditioned during recovery from a football injury. Their conversations initially focused on exercise. Subsequently, Allison and John Doe II exchanged Instagram contact information in connection with her role as a yearbook advisor and John Doe II's drafting of his senior quote. Allison, who was not one of John Doe II's teachers, summoned him from his classes to her classroom on more than five occasions during school hours, ostensibly to review his yearbook quote. She repeatedly declined to approve his quote on the ground that it was not appropriate for publication; John Doe II disagreed with her assessment because the quote made no references to profanity, drug or alcohol use, or sexual activity. During these brief visits, Allison raised the topic of the recent passing of John Doe II's father and offered to help because she had experience involving a friend's suicide attempt. Their conversations then became more personal and included the topic of her troubled marriage to Robert.

John Doe II and Allison also began to exchange messages on Instagram; John Doe II was curious to see whether her communications with him would be as inappropriate as they were with John Doe I. Several weeks later, the content of the messages progressed from school or athletic topics to "[s]trictly . . . personal" topics, including Allison's marital problems, and she sent him sexually suggestive photographs of herself and engaged in banter containing sexual overtures. Although John Doe II became increasingly uncomfortable with the conversations, he did not report or try to stop them because he was afraid of the social repercussions should other students learn of his relationship with Allison.

In December, 2014, Allison sent an Instagram message inviting John Doe II to her classroom during a free period, where she closed the blinds, locked the door, kissed him, and performed fellatio on him. This was the sole occasion that Allison and John Doe II had physical contact. After that encounter, John Doe II was

"scared" and "ghosted" Allison; she continued, however, to try to contact him, with further Instagram messages inviting him over to her home for sexual activity because Robert would be away performing with his band.

All three plaintiffs tired of Allison's advances and conduct, particularly as they feared the spread of rumors about what Allison had done with John Doe II. The plaintiffs then met—in the words of John Doe II—to create a plan "to get rid of her." The plaintiffs subsequently met with Allison in a contentious encounter, after which John Doe I and John Doe II reported her to Salutari, the high school's principal. On January 7, 2015, Allison was arrested and charged with the sexual assault of John Doe II. She ultimately pleaded guilty and was sentenced to two years imprisonment.[8]

Although Allison was secretive about her activities with the plaintiffs, her appearance and attire had attracted attention around the school and the community.[9] At summer football practices, Allison would wear only a sports bra and tight fitting athletic shorts made of a spandex type material,[10] leading some of the male football coaches to compliment her appearance and ask her to wear the shorts again.[11] She did not think that request was appropriate but was not offended because she considered it "good-natured teasing amongst friends . . . ." Most of the football coaches, including Steve Filippone, the head football coach, considered Allison's attire to be appropriate because it was consistent with what they often saw young women wear to exercise in settings like the gym, particularly given the summer heat. The coaches flirted with Allison often, and they frequently engaged in "locker [room] talk" among themselves about her appearance.[12] They believed that she was trying to get the attention of the male students, with one coach, Michael Ferraiolo, joking that she would not be interested in a group of "middle-aged bald men" like themselves.

Semple, the high school's athletic director, believed that it would have been unprofessional and inappropriate for any female coach to wear only a sports bra around the student athletes; although he did not personally witness Allison dressed that way, had he done so, he would have asked her to cover up by giving her a high school T-shirt.[13] Allison was not the first woman who worked professionally with the football team; they frequently had women contracted as athletic trainers. The coaches hired Allison because of her training expertise and excellent reputation as a teacher. No member of the high school's athletic staff ever witnessed Allison flirting with any student athletes.

Finally, we note that Allison attributed her behaviors that gave rise to these cases to her troubled marriage to Robert; those difficulties were exacerbated by Robert's view of the public attention that she was attracting on

social media and around the school, including attention from male students who had been flirting with her. Allison and Robert often fought publicly at the school in front of other faculty and students, during lunch in the teachers' lounge, at staff meetings, and in her classroom, where he once threw items off her desk and across the room. One incident involving their marriage occurred at a Friday night football game, where Robert witnessed Allison interacting from the stands with three suited up football players, who were standing on the sideline below, in a way that made him feel uneasy; Robert was angered by Allison "act[ing] as though she was a wonderful mother" by holding their toddler daughter as a "prop." He was "disgusted" because he believed that she was "very appreciative" of how the football players were watching her while she was elevated above them in the stands, smiling, laughing, and flicking her head back to clear the hair from her eyes. Robert thought that Allison's "preening and posturing behavior" was intended to elicit a reaction from him, given their marital difficulties.[14] He told her that "we're going to read about [you] in the newspaper someday." Robert believed Allison to be "a woman [who] was teetering on the precipice of being kind of unhealthy and making some bad decisions and being very unhealthy and making some bad decisions, never at the expense of [her] students but at the expense of [their] marriage and [their] own . . . security."[15] Indeed, Robert described Allison as someone who, to that point, had otherwise been a "law-abiding" person "who walked the straight and narrow," which made the news of her sexual activities with the plaintiffs even more shocking to him. Subsequently, Robert wrote a book about the events of these cases.[16]

The plaintiffs brought these actions for damages pursuant to the municipal liability statute, § 52-557n, claiming in the operative complaints that they were injured by the defendants' failure, among other things, (1) to prevent and/or interrupt Allison's inappropriate relationship with the plaintiffs and her participation in extracurricular activities involving the physical training of male students, (2) to report Allison's conduct to the proper authorities in violation of their ministerial duties under the board reporting policy and the mandatory reporting statutes, given their "constructive notice" of her conduct because multiple teachers had reasonable cause to believe that she was sexually abusing the plaintiffs, (3) to monitor Allison's social media usage to ascertain whether she was violating policies concerning communications between teachers and students, and (4) to properly train and supervise their employees, particularly with respect to the warning signs of inappropriate relationships between students and teachers, and the use of classrooms and hallways.[17] The trial court subsequently granted the defendants' motions to consolidate the three cases for discovery, trial and

apportionment of liability. See Practice Book § 9-5 (a).

After discovery, the defendants moved for summary judgment, arguing, with respect to the issues in this appeal, that the plaintiffs could not establish negligence and causation and, further, that they were entitled to governmental immunity under § 52-557n. In response, the plaintiffs contended that there were numerous genuine issues of material fact that precluded summary judgment, including (1) whether the defendants had breached their ministerial duty to report Allison under the board reporting policy and the mandatory reporting statutes, and (2) whether the plaintiffs were identifiable persons subject to imminent harm for purposes of that exception to discretionary act immunity under § 52-557n (a) (2) (B).

The trial court granted the defendants' motions for summary judgment in all three cases. Determining that the duty to report the abuse of students is ministerial in nature given the dictates of the mandatory reporting statute and the board reporting policy, the trial court nevertheless concluded that there was no evidence to provide any of the high school staff members with the requisite "reasonable cause to suspect" that Allison was sexually abusing the plaintiffs. See General Statutes § 17a-101a (a) (1). The trial court contrasted the record in these cases with other Superior Court cases in which "the mandatory reporter either witnessed the abuse or the child told the mandatory reporter or school employee about the abuse." The trial court emphasized testimony that no school employee, including the football coaches, had ever witnessed Allison flirt with any male students and that she had always reacted appropriately when male students flirted with her. The trial court observed that none of the social media posts at issue would have triggered a "reasonable suspicion that a student was being abused or was at risk of imminent harm," and rejected the plaintiffs' reliance on Allison's attire at football practices because "the fact that [she] dressed inappropriately is not enough alone or in conjunction with any other event to cause reasonable suspicion in a school employee that a student is being abused or at risk of imminent harm." Further, the court observed that the plaintiffs' visits to Allison's classroom would not have created reasonable cause to suspect abuse, insofar as they were brief in duration and spaced out in frequency, giving no reason for any teacher to question the plaintiffs' whereabouts or the legitimacy of their visits to her classroom. For the same reasons, the court also concluded that the plaintiffs had not raised a genuine issue of material fact with respect to the applicability of the identifiable person-imminent harm exception to discretionary act immunity.[18]

Finally, with respect to other issues, the trial court declined to consider the arguments of John Doe II and John Doe III that a ministerial duty of professionalism

was established by the testimony of Semple, the high school athletic director. The court concluded in footnotes that a breach of any such duty was not pleaded in the complaints. Similarly, the court concluded that John Doe III had failed to plead the claim, first asserted in his objection to the motion for summary judgment, that the town or its police department had breached an obligation to monitor the security cameras at the high school and emphasized that a plaintiff cannot make a factual allegation for the first time in response to a motion for summary judgment.[19] Accordingly, the court granted the defendants' motions for summary judgment in all three cases and rendered judgments accordingly. These appeals followed.

Before turning to the plaintiffs' specific claims, we note the following relevant background principles. Beyond the well established standard by which we engage in plenary review of a trial court's grant of summary judgment, the "following principles of governmental immunity are pertinent to our resolution of the [plaintiffs'] claims. The . . . doctrines that determine the tort liability of municipal employees are well established. . . . Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts. . . . Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . The hallmark of a discretionary act is that it requires the exercise of judgment. . . . In contrast, [a ministerial act] refers to a duty which is to be performed in a prescribed manner without the exercise of judgment or discretion. . . .

"Municipal officials are immunized from liability for negligence arising out of their discretionary acts in part because of the danger that a more expansive exposure to liability would cramp the exercise of official discretion beyond the limits desirable in our society. . . . Discretionary act immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury. . . . In contrast, municipal officers are not immune from liability for negligence arising out of their ministerial acts, defined as acts to be performed in a prescribed manner without the exercise of judgment or discretion. . . . This is because society has no analogous interest in permitting municipal officers to exercise judgment in the performance of ministerial acts. . . .

"The tort liability of a municipality has been codified in § 52-557n. Section 52-557n (a) (1) provides that [e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person

or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties . . . . Section 52-557n (a) (2) (B) extends, however, the same discretionary act immunity that applies to municipal officials to the municipalities themselves by providing that they will not be liable for damages caused by negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law. . . .

"For purposes of determining whether a duty is discretionary or ministerial, this court has recognized that [t]here is a difference between laws that impose general duties on officials and those that mandate a particular response to specific conditions. . . . A ministerial act is one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done. . . . In contrast, when an official has a general duty to perform a certain act, but there is no city charter provision, ordinance, regulation, rule, policy, or any other directive [requiring the government official to act in a] prescribed manner, the duty is deemed discretionary." (Internal quotation marks omitted.) *Cole* v. *New Haven*, 337 Conn. 326, 336–38, 253 A.3d 476 (2020).

## I

## MINISTERIAL DUTY CLAIMS

This appeal presents two issues with respect to claimed violations of a ministerial duty. First, the plaintiffs contend that there was a genuine issue of material fact with respect to whether the defendants breached their ministerial duty to report a reasonable suspicion of child abuse, as imposed by the mandatory reporting statute and the board reporting policy. Second, John Doe II claims that the testimony of Semple, the athletic director, established a ministerial duty of professionalism and that there was a genuine issue of material fact with respect to whether Allison's attire constituted a breach of that duty. We address each claim in turn.

## A

## Mandatory Reporting of Sexual Abuse

The plaintiffs first claim that the trial court incorrectly concluded that there was no genuine issue of material fact that the defendants had not breached their ministerial duty under the mandatory reporting statute and the board reporting policy to report child abuse, the language of which mirrors the statute in all relevant aspects. The plaintiffs argue that the trial court improperly required them to prove that the teachers involved had actual knowledge of abuse, rather than applying the objective standard of "reasonable cause" to believe

the existence of abuse. The plaintiffs then cite an array of conduct by Allison that they argue constituted reasonable cause for numerous high school employees to suspect an imminent risk of sexual abuse or sexual abuse of students by Allison. With respect to the football practices, they contend—in the words of John Doe III—that Allison's "sexually explicit" act of wearing "skimpy shorts and sports bras that exposed her genitalia and breasts" created reasonable cause for the coaches to "suspect or believe" that they were at "imminent risk of sexual mental abuse," particularly given the coaches' apparent belief that she dressed that way to get the attention of the male student athletes. Turning to events during school hours, they also rely on Robert's claimed awareness of Allison's inappropriate attire in numerous settings and her flirtatious behavior with students, observing that John Doe I specifically believed that Robert did not like him and was aware that he had connected on social media with Allison, and Robert's confrontation of her at a Friday night football game, some of which Robert highlighted in a book he wrote about this incident. See footnotes 7 and 16 of this opinion. John Doe I and John Doe II also argue that reasonable cause for suspicion of sexual abuse or the imminent risk of sexual abuse is established by their repeated visits to Allison's classroom, with John Doe II being summoned from multiple classes to revise his yearbook quote, and the fact that she had locked her room for ten minutes during the school day when she assaulted John Doe II. John Doe III cites the unmonitored security cameras, which would have aroused a reasonable suspicion with respect to the plaintiffs' visits to Allison's classroom if monitored, as illustrative of the "lackadaisical environment" at the high school that he contends reflected a dereliction of duty, reminiscent of "the three sitting monkeys: Hear no evil. See no evil. Speak no evil."

In response, the defendants concede the existence of a ministerial duty to report a reasonable suspicion of sexual abuse but argue that there was no breach of that duty because the facts in this record do not support a reasonable belief of sexual abuse given the "totality of the circumstances" at the time. They observe that there are no cases supporting a finding of reasonable suspicion without a reporter witnessing or being told firsthand of abuse. Turning to the specific facts of this case, the defendants argue that evidence of Robert's anger at Allison's attention seeking behavior, including her interaction with the football players at the Friday night game, did not amount to reasonable cause because Robert did not think that Allison was a danger to students.[20] The defendants also rely on undisputed testimony that it was not unusual for students to be called out of classes or to visit with teachers individually, and that Allison's visits with the plaintiffs were brief in duration and occurred in a way that would not

draw the attention from any individual teacher. They emphasize that there was no evidence that any teacher ever saw Allison actually flirt with or make sexual overtures to any student, including the closest situation, namely, when Robert saw her interact with the football players at the Friday night game. Similarly, the defendants argue that there is no evidence that any staff member was aware of the social media messaging between the plaintiffs and Allison or Allison's paying attention to John Doe I during football practices. Finally, the defendants contend that Allison's attire would not support a conclusion that she was abusing students because (1) most teachers and staff members viewed her attire as appropriate, and (2) as is reflected in the advisory committee notes to rule 412 of the Federal Rules of Evidence, the use of a person's attire to establish her sexual proclivities is "unreliable, at best, and sexist and narcissistic, at worst."[21] We agree with the defendants' argument that, on the facts of this case, there is no evidence to support reasonable cause for any of their employees to suspect that Allison was sexually abusing the plaintiffs or exposing them to an imminent risk of sexual abuse by her.

We begin by noting that it is undisputed that the employees of the town and the board—Principal Salutari, all teachers, including Robert, and the various football coaches—had a ministerial duty under the board reporting policy and the mandatory reporting statute to report to the Commissioner of Children and Families if, "in the ordinary course of [their] employment or profession," they obtained "reasonable cause to suspect" abuse of or "imminent risk of serious harm" to a child or student.[22] General Statutes § 17a-101a (a) (1); see also General Statutes § 17a-101a (b) (providing criminal penalties for failure to report); General Statutes § 17a-101b (prescribing content of report, twelve hour reporting deadline from point at which reasonable cause to suspect abuse occurs, and reporting process). Consistent with case law governing the concept of "reasonable suspicion" in the criminal law context, the mandatory reporting statute provides that "suspicion or belief may be based on factors including, but not limited to, observations, allegations, facts or statements by a child, victim . . . or third party. *Such suspicion or belief does not require certainty or probable cause.*" (Emphasis added.) General Statutes § 17a-101a (d); see, e.g., *State* v. *Peterson*, 320 Conn. 720, 730–31 n.4, 135 A.3d 686 (2016) ("Reasonable and articulable suspicion is a lower standard than probable cause. . . . Proof of probable cause requires less than proof by a preponderance of the evidence, or in other words, less than proof that something is more likely than not." (Citation omitted; internal quotation marks omitted.)). Thus, reasonable cause to suspect "is an objective standard that focuses not on the actual state of mind of the [decision maker], but on whether a reasonable person, having

the information available to and known by the [decision maker], would have had that level of suspicion." (Internal quotation marks omitted.) *State* v. *Peterson*, supra, 730. The assessment considers the "totality of the circumstances" at the time of the decision and must be based on "specific and articulable facts" and "rational inferences" taken therefrom. (Internal quotation marks omitted.) Id., 731. Whether reasonable cause or suspicion exists in view of a given set of facts presents a question of law subject to plenary review. See, e.g., *State* v. *Houghtaling*, 326 Conn. 330, 353–54, 163 A.3d 563 (2017), cert. denied,    U.S.   , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018); *State* v. *Butler*, 296 Conn. 62, 72, 993 A.2d 970 (2010).

Considering the totality of the circumstances demonstrated by the evidence produced by the defendants, and unchallenged by the plaintiffs, we conclude that none of the defendant's employees had reasonable cause to suspect that Allison was sexually abusing any of the plaintiffs or exposing them to an imminent risk of sexual abuse. First, Allison's personnel record was unblemished, and she was held in uniformly high regard by her colleagues and students at the high school; indeed, she was known to handle the common situation of student crushes appropriately by politely rebuffing them.[23] Second, although all of the teachers and coaches who testified at depositions in these cases agreed that it would be inappropriate and reportable misconduct for a teacher to flirt with a student, none of those teachers or coaches ever witnessed Allison flirting with a student, including any of the three plaintiffs. Even if we assume, without deciding, that Allison had acted in a flirtatious manner—consciously or not—at the Friday night football game by smiling, laughing, and tossing her hair in front of Robert and three football players, that conduct is simply too far removed from any type or instance of sexual abuse to supply reasonable cause to suspect an imminent risk of such abuse.

Third, the three plaintiffs' repeated visits to Allison's classroom did not appear unusual to other faculty members at the school because, as numerous faculty and staff members testified, teachers frequently called students to different classrooms at various points during the school day. It also was common for teachers to visit students in other classrooms for a variety of academic and extracurricular reasons, often to address academic performance issues, such as incomplete work. There also were open periods at the end of the day when students could freely visit teachers for extra help. Moreover, Allison had a seemingly legitimate reason to summon students in her capacity as faculty yearbook advisor, and she varied the days and times at which she summoned the plaintiffs in order to avoid detection. John Doe II and John Doe III testified that they were never called out from any individual teacher's class more than twice.

Fourth, even if we assume, without deciding, that Allison's attire at the football practices and in the gym pushed the boundaries of propriety in an educational setting, there is absolutely no evidence of nudity in front of students; see footnote 11 of this opinion; and her attire does not indicate that she was engaged, or inclined to engage, in sexual impropriety with students. Cf. Fed. R. Evid. 412, advisory committee notes ("The rule has been amended to . . . exclude all other evidence relating to an alleged victim of sexual misconduct that is offered to prove a sexual predisposition. . . . Admission of such evidence would contravene [r]ule 412's objectives of shielding the alleged victim from potential embarrassment and safeguarding the victim against stereotypical thinking. Consequently, unless the (b) (2) exception is satisfied, *evidence such as that relating to the alleged victim's mode of dress*, speech, or [lifestyle] will not be admissible." (Emphasis added.)).

In his brief, John Doe II identifies a seventeen fact chain[24] that, he argues, would suggest that people at the school should have known what was happening with the plaintiffs. We agree with the trial court that this piling of inferences distorts the actual reality apparent to the various employees in real time. See *Doe ex rel. Brown* v. *Pontotoc County School District*, 957 So. 2d 410, 418 (Miss. App. 2007) ("[i]n retrospect, it is easier to see the signs of inappropriateness in [the coach's] actions, but at the time they were occurring, there was insufficient proof to claim the [school] [d]istrict was negligent in not taking action"); see also *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 575, 717 A.2d 215 (1998) ("virtually all harms, in hindsight, are literally foreseeable" (internal quotation marks omitted)). By aggregating the facts as they do, the plaintiffs impermissibly attribute knowledge of all of the facts to each of the high school's employees. As the plaintiffs themselves agree, each defendant must be judged on the basis of only those particular facts known to that person. Put differently, aggregating the seventeen facts to create reasonable cause to suspect sexual abuse or imminent risk thereof is akin to charging the various high school employees with the responsibility of viewing a completed jigsaw puzzle, when all any of them could see at any relevant time was a piece or two. We do, however, emphasize that mandated reporters, such as the school employees involved in this case, should not hesitate to ask questions or to act further—including by making a report—when confronted with a situation that might in fact be an indicator of abuse. Indeed, the legislature envisioned such difficult decisions when it extended immunity to good faith reporters of suspected abuse or neglect in General Statutes § 17a-101e (b). See *Ward* v. *Greene*, 267 Conn. 539, 559–60, 839 A.2d 1259 (2004).

Moreover, even when the facts of this case are viewed in the aggregate and with the benefit of hindsight, they

are still far less compelling than those in cases in which sister state courts have held that there was no duty to report under mandatory reporting statutes.[25] See, e.g., *Doe ex rel. Doe* v. *Boy Scouts of America*, 4 N.E.3d 550, 556–57, 562–63 (Ill. App. 2014) (distinguishing case from those involving more "unequivocally salacious overtures" and concluding that volunteer's report that scouting executive was " 'weird around kids' " at church and would go to YMCA on day of boys' swim team practices and position himself in way that he could use mirror to watch boys change clothes did not trigger mandatory reporting obligations because it was "not so clearly prurient, and did not signal such an immediate danger to scouts, as to warrant depriving him of any opportunity to explain himself"); *Doe* v. *Logan*, 602 S.W.3d 177, 187–88 (Ky. App.) (teacher was not obligated to report colleague because he was not aware of colleague's abuse of special education student, despite fact that he had observed colleague engage in otherwise "inappropriate behavior" that he did not "believe . . . was sexual in nature," including "holding, hugging, or putting arms around students"), review denied, Kentucky Supreme Court, Docket No. 2020-SC-0085 (July 1, 2020); *Doe ex rel. Brown* v. *Pontotoc County School District*, supra, 957 So. 2d 418 (school did not breach duty to report affair between teacher and teenaged student when evidence consisted of single "uncorroborated rumor," all physical contact occurred while teacher and student were alone, except for rubbing of shoulders at basketball game that "apparently went unnoticed by attendees," teacher had good reputation and employment history, and their interactions were "under the guise of innocence," such as tutoring); cf. *Doe* v. *Dimovski*, 336 Ill. App. 3d 292, 296–97, 783 N.E.2d 193 (contrasting case to one consisting only of rumors that had been denied by students themselves and concluding that female student's direct report of sexual abuse to school counselor created ministerial duty to report), appeal denied, 204 Ill. 2d 658, 792 N.E.2d 306 (2003). Accordingly, we conclude that the trial court correctly determined that, on the facts in this record, none of the high school personnel had reasonable cause to believe that Allison was sexually abusing any of the plaintiffs or exposing them to an imminent risk of sexual abuse.

## B

### Whether Semple's Testimony Established a Ministerial Duty of Professionalism

We next address John Doe II's contention that the trial court incorrectly concluded that the testimony of Semple, the high school athletic director, did not establish a "ministerial duty of professionalism for his subordinates." Specifically, John Doe II relies on Semple's testimony that he "expected his subordinates, including head [football] coach Filippone, to enforce certain stan-

dards of professionalism, including requiring any coach, male or female, to cover up if shirtless." John Doe II argues that the "failure to enforce this duty" resulted in "the defendants' permitting the now convicted sexual predator Allison . . . to dress in only the most fundamental attire while addressing the high school football team in her role as a core conditioning coach." John Doe II then contends that there is ample evidence to establish that Semple failed to communicate the duty of professionalism to his staff, which itself raises a question of fact precluding summary judgment.

In response, the defendants rely on *Ventura* v. *East Haven*, 330 Conn. 613, 199 A.3d 1 (2019), and argue that, with no formal dress code or policy in place at the high school, Semple's testimony about "professionalism" did no more than establish a general practice by which discretion is exercised, particularly given that the faculty collective bargaining agreement would have created problems with enforcing his version of "common sense" rules about attire. See footnote 14 of this opinion. We agree with the defendants and conclude that Semple's opinion of what constitutes professionalism, standing alone, cannot provide the basis for a clearly promulgated policy directed toward all school employees and does not, therefore, create a ministerial duty.[26]

"[O]ur courts consistently have held that to demonstrate the existence of a ministerial duty on the part of a municipality and its agents, a plaintiff ordinarily must point to some statute, city charter provision, ordinance, regulation, rule, policy, or other directive that, *by its clear language*, compels a municipal employee to act in a prescribed manner, without the exercise of judgment or discretion." (Emphasis added; internal quotation marks omitted.) *Cole* v. *New Haven*, supra, 337 Conn. 338. A ministerial duty need not be written and may be created by oral directives from superior officials, the existence of which are established by testimony. See *Ventura* v. *East Haven*, supra, 330 Conn. 639–41; see also *Cole* v. *New Haven*, supra, 342 ("[w]hen the facts are viewed in the light most favorable to the plaintiff, we conclude that [the police sergeant's] testimony, in combination with the [municipal pursuit policy] and the [statewide pursuit policy], establishes the existence of a ministerial duty as a matter of law not to use a complete roadblock maneuver to stop the plaintiff simply for violating the city's dirt bike ordinance, and also provides evidence from which a reasonable fact finder could conclude that [the police officer] violated that ministerial duty"); *Ventura* v. *East Haven*, supra, 640 n.14 ("in the absence of an explicit written directive, the testimony of a municipal official may be sufficient to establish the existence of a ministerial duty"). In contrast, descriptions of general practices or expectations that guide an employee's exercise of discretion do not create a ministerial duty. See *Ventura* v. *East*

*Haven*, supra, 640–41 ("There are, no doubt, any number of guidelines and practices that police officers adhere to when responding to the myriad situations they confront on a daily basis. The mere fact that an officer, either by training or experience, ordinarily responds to a situation in a particular manner does not transform his or her response into a ministerial duty."). Specificity is required in all aspects of the directive. See *Strycharz* v. *Cady*, 323 Conn. 548, 566–67, 148 A.3d 1011 (2016) (concluding that school superintendent's "testimony provided a sufficient basis to conclude that school administrators had the ministerial duty to assign staff members to monitor students throughout the school" but also "contains no directive sufficient to support a finding that [the administrators] had the ministerial duty to ensure that assigned staff members, once notified of their responsibilities, *actually* reported to and adequately discharged their assignments" (emphasis in original)); see *Marvin* v. *Board of Education*, 191 Conn. App. 169, 176–78, 213 A.3d 1155 (2019) (ministerial duty was not created by custodian's "job description [that] provides [only] generally that the custodial staff '[p]erforms necessary work to maintain the cleanliness and appearance of all hard surface flooring, including . . . mopping,' " and "there was no specific policy, procedure, or directive that applied to the inspection and maintenance of the floors at the school, and . . . there existed only a general policy that the school should be maintained in a clean and safe condition").

We agree with the defendants that Semple's testimony about "professionalism" lacked the specificity necessary to create an enforceable ministerial duty. In contrast to a specific dress code—which Salutari testified did not exist at the high school because of collective bargaining issues; see footnote 14 of this opinion; there is no evidence that Semple's views of professionalism in attire ever were communicated to the school employees in a manner that clearly established a duty to dress in a prescribed way, without the exercise of judgment or discretion. Accordingly, we conclude that Semple's conception of professionalism is not by itself a sufficiently definite and specific concept to serve as the basis for a ministerial duty and that the trial court properly granted summary judgment with respect to this issue.

## II

## IDENTIFIABLE PERSON-IMMINENT HARM EXCEPTION TO DISCRETIONARY ACT IMMUNITY

John Doe II and John Doe III next claim that the trial court incorrectly concluded that the identifiable person-imminent harm exception to discretionary act immunity, as explicated in *Haynes* v. *Middletown*, 314 Conn. 303, 312–23, 101 A.3d 249 (2014), and *Doe* v. *Petersen*, 279 Conn. 607, 616–21, 903 A.2d 191 (2006), does not

apply in this case. Acknowledging that the trial court correctly determined that he was an identifiable person during school hours, John Doe II argues that the seventeen facts that provide reasonable cause to report a suspicion of sexual abuse; see footnote 23 of this opinion; also render him a person subject to imminent harm, with the likelihood of that harm apparent to the defendants as public officials. John Doe III argues similarly, relying on (1) Allison's attire at summer football practices, "in full view and knowledge of the coaching staff three times a week for six weeks," (2) his deposition testimony about how often he was summoned from class, and (3) numerous hall monitors' collective failure to question any of the plaintiffs "as to their reasons for being out of class or going to [Allison's] classroom." John Doe III also relies on the fact that the school resource officer and the school administration did not actively monitor the high school's video security system.

In response, the defendants argue that John Doe II and John Doe III were identifiable victims only during school hours, and not during the optional summer football program, meaning that only four of the claimed circumstances apply to support a claim that there was imminent harm. Citing the remoteness of the harm considered in *Brooks* v. *Powers*, 328 Conn. 256, 178 A.3d 366 (2018), the defendants emphasize that no one was aware that the plaintiffs had been called out of class excessively, as it was not unusual for a student to visit a different classroom or to receive a bagel from a teacher. They also contend that there is no evidence to support the proposition that Allison's attire made it more likely that she would perform a sexual act on a student, particularly given that the act did not occur until December, 2014, and that she wore the attire in question during the summer. Quoting *Edgerton* v. *Clinton*, 311 Conn. 217, 231, 86 A.3d 437 (2014), the defendants emphasize that there is no duty to inquire and that "[t]he 'apparentness' prong of the identifiable person-imminent harm exception is an objective test pursuant to which the courts 'consider the information available to the [school official] at the time of [his or] her discretionary act or omission.'" The defendants emphasize that, because additional inquiry is not required, "the same reason that the circumstances did not support reasonable suspicion of abuse of" John Doe II or John Doe III means that "there is no evidence that the circumstances would have made it apparent to a reasonable school official that harm . . . was imminent . . . ." We agree with the defendants' argument that there is no genuine issue of material fact with respect to the apparentness element of the identifiable person-imminent harm exception to governmental immunity.[27]

It is well established that "[§] 52-557n abandons the common-law principle of municipal sovereign immunity and establishes the circumstances in which a municipality may be liable for damages. . . . One such circum-

stance is a negligent act or omission of a municipal officer acting within the scope of his or her employment or official duties. . . . [Section] 52-557n (a) (2) (B), however, explicitly shields a municipality from liability for damages to person or property caused by the negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law. . . .

"This court has recognized an exception to discretionary act immunity that allows for liability when the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . . This identifiable person-imminent harm exception has three requirements: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm. . . . All three must be proven in order for the exception to apply. . . . [T]he ultimate determination of whether [governmental] immunity applies is ordinarily a question of law for the court . . . [unless] there are unresolved factual issues . . . properly left to the jury." (Citations omitted; internal quotation marks omitted.) *Martinez* v. *New Haven*, 328 Conn. 1, 8, 176 A.3d 531 (2018).

We begin by noting that it is undisputed that, because John Doe II and John Doe III were "public school student[s] at school during school hours, [they were] . . . identifiable person[s] for purposes of the imminent harm to identifiable persons exception"; id., 9; and, for the purpose of addressing the plaintiffs' claims in this appeal, we assume without deciding that they occupied that status during football practices, as well.[28] But see *St. Pierre* v. *Plainfield*, 326 Conn. 420, 436, 165 A.3d 148 (2017) ("[O]ur decisions underscore . . . that whether the plaintiff was compelled to be at the location where the injury occurred remains a paramount consideration in determining whether the plaintiff was an identifiable person or member of a foreseeable class of victims. . . . Accordingly, [t]he only identifiable class of foreseeable victims that we have recognized . . . is that of schoolchildren attending public schools during school hours . . . ." (Internal quotation marks omitted.)); *Maselli* v. *Regional School District No. 10*, 198 Conn. App. 643, 656–57, 235 A.3d 599 (middle school soccer player was not identifiable person given voluntary nature of participation in sport), cert. denied, 335 Conn. 947, 238 A.3d 19 (2020). Accordingly, our focus in this appeal is on whether the trial court correctly concluded that the defendants' acts or omissions did not implicate either an imminent harm or "a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." (Internal quotation marks omitted.) *Martinez* v. *New Haven*, supra, 328 Conn. 8.

Our recent decision in *Martinez* aptly summarizes the line of decisions in the wake of *Burns* v. *Board of Education*, 228 Conn. 640, 649, 638 A.2d 1 (1994), overruled on other grounds by *Haynes* v. *Middletown*, 314 Conn. 303, 101 A.3d 249 (2014), which apply the identifiable person-imminent harm exception to discretionary act immunity in the public school context, and we need not repeat that detailed analysis here. See *Martinez* v. *New Haven*, supra, 328 Conn. 8–10. It suffices to say that "the proper standard for determining whether a harm was imminent is whether it was apparent to the municipal defendant that *the dangerous condition was so likely to cause harm that the defendant had a clear and unequivocal duty to act immediately to prevent the harm.*" (Emphasis added; internal quotation marks omitted.) Id., 9. Applying that standard, we conclude that there is no genuine issue of material fact with respect to either the imminence or apparentness prongs. Sexual abuse causes unmistakably serious harm to its victims, but the facts of this case suggest that Allison's actions—in particular her sexual assaults of John Doe II and John Doe III—were the culmination of a generally clandestine pattern of behavior. Although some might have viewed Allison's attire at the summer football practices as inappropriate for an educational setting, there is nothing to suggest that anyone would reasonably anticipate a sexual assault of a student would be the immediate result of that attire.[29] Cf. *Brooks* v. *Powers*, supra, 328 Conn. 273–75 (woman who drowned in water one-half mile from where she was seen standing in field during storm was not identifiable person subject to imminent harm for purposes of constables' failure to respond given attenuation between drowning and risk of being in field); *Maselli* v. *Regional School District No. 10*, supra, 198 Conn. App. 658–59 ("exacerbated postconcussion symptoms and diminished academic performance" were "too attenuated" from injury and allegedly negligent response by coach when middle school soccer player was struck in face by ball to be imminent or apparent). This is particularly so, given that Allison's professional record had been unblemished until the events of this case, and she was held in uniformly high regard by students and faculty alike. Moreover, there is no evidence that the plaintiffs' repeated visits to Allison's classroom were abnormalities that should have been apparent to any staff members, given the undisputed evidence that students routinely visited teachers' classrooms at numerous times for legitimate pedagogical or extracurricular reasons, and Allison avoided raising suspicion by summoning the plaintiffs at a diverse array of times over an extended period of months. Indeed, those staff members, such as hallway monitors, were under no duty to ask questions beyond what was immediately apparent. See, e.g., *Edgerton* v. *Clinton*, supra, 311 Conn. 231–32; see also *Doe* v. *Petersen*, supra, 279 Conn. 609, 619–21

and n.11 (fifteen year old tennis player who suffered emotional distress when supervisor " 'cut [her] off' " from further disclosure of sexual abuse suffered at hands of coach was not subject to exception when manager had no idea of sexual assault that had been suffered). Finally, Robert's apparently negative reaction to Allison's interaction with the football players at the Friday night game cannot be understood as evincing a belief that she was *imminently* about to engage in an illegal sexual relationship with any student, let alone any of the plaintiffs specifically. Accordingly, we conclude that the trial court correctly determined that neither John Doe II nor John Doe III satisfied the imminent harm to identifiable persons exception to governmental immunity.

## III

### VIDEO MONITORING CLAIMS

Finally, we address the claim of John Doe III that the trial court incorrectly determined that he failed to allege in his complaint that the town was liable for the inactions of a police officer assigned as a school resource officer at the high school because that officer was an employee of both the town and the board. John Doe III contends that the trial court incorrectly determined that he had raised this claim for the first time in his memorandum of law objecting to summary judgment when his complaint "clearly alleged" that the town, acting through the police department, "failed to properly monitor the classrooms and hallways with proper personnel or through the use [of] video surveillance that existed [when] the sexual assault of John Doe [III] took place."

In response, the defendants do not challenge John Doe III's argument that the trial court improperly construed his complaint, but argue—ostensibly as an alternative ground on which to affirm the judgment of the trial court—that the "trial court rightly analyzed the evidence, which was that [Principal Salutari] said the police had access to the footage, not that they had a duty to monitor the classrooms or anywhere else [that John Doe III's] activity may have occurred." The defendants contend that there was no evidence that "the police [had] the ability to monitor security video transmissions" and that, "even if they did, it does not establish that the police had any duty to do so. . . . Salutari expressly stated that the video was not monitored, much less that anyone had a duty to monitor it in any way differently from the way he testified it was used, namely, to go back after an incident to determine if the cameras detected it." We agree with the defendants and conclude that there is no evidence of any ministerial duty to monitor the security camera footage, rendering this a classic discretionary act subject to governmental immunity under § 52-557n (a) (2) (B).

Having reviewed the record in the absence of a reply brief challenging the defendants' assertions, we conclude that the trial court correctly determined that there was no evidence of a policy governing the manner and frequency with which security cameras and their footage are monitored. See footnote 19 of this opinion. Insofar as the plaintiffs failed to establish the existence of a ministerial duty in this regard, the high school's use of the security cameras remained a discretionary act. See, e.g., *Lewis* v. *Newtown*, 191 Conn. App. 213, 232, 214 A.3d 405 ("it is clear that the adoption of the school security guidelines by the defendants was an act of discretion encompassed within their general duty to manage and supervise their employees and the schoolchildren, and, therefore, was protected by governmental immunity pursuant to § 52-557n (a) (2) (B)"), cert. denied, 333 Conn. 919, 216 A.3d 650 (2019); see also *Strycharz* v. *Cady*, supra, 323 Conn. 568–69 (public school administrators' "general responsibility to manage and supervise school employees" is discretionary act). Accordingly, we conclude that the trial court properly granted the defendants' motions for summary judgment.

The judgments are affirmed.

In this opinion the other justices concurred.

* July 30, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We refer to the plaintiffs individually where appropriate for purposes of clarity.

[2] The plaintiffs appealed from the judgments of the trial court to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Although the appeals were briefed and argued separately, we resolve them in a single opinion given that they were consolidated in the trial court and present several common factual and legal issues.

[3] John Doe I initially named only the town as a defendant; subsequently, the trial court, *Agati*, *J.*, granted his motion to add the board as a defendant. Thereafter, John Doe I and John Doe II withdrew their claims against the town.

John Doe II and John Doe III also named Allison as a defendant. Allison has not appeared in these appeals. Accordingly, unless otherwise noted, all collective references herein to the defendants are to the board, the town, and Salutari.

[4] General Statutes § 17a-101 provides in relevant part: "(a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse or neglect, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.

"(b) The following persons shall be mandated reporters . . . (9) any school employee, as defined in section 53a-65, (10) any social worker, (11) any person who holds or is issued a coaching permit by the State Board of Education, is a coach of intramural or interscholastic athletics and is eighteen years of age or older, (12) any individual who is employed as a coach or director of youth athletics and is eighteen years of age or older . . . (15) any police officer . . . ."

Like the trial court and the parties, we refer to the current revision of the statute. We note, however, that the legislature has made significant changes to § 17a-101 since the 2013 revision of the statute, which would have governed when the events underlying this appeal began, including in

2014; see Public Acts 2014, No. 14-186, § 6 (effective October 1, 2014); when those events were ongoing. None of those amendments changed the obligations of any of the various actors in these cases.

[5] General Statutes § 17a-101a provides in relevant part: "(a) (1) Any mandated reporter, as described in section 17a-101, who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any child under the age of eighteen years (A) has been abused or neglected, as described in section 46b-120, (B) has had nonaccidental physical injury, or injury which is at variance with the history given of such injury, inflicted upon such child, or (C) is placed at imminent risk of serious harm, or (2) any school employee, as defined in section 53a-65, who in the ordinary course of such person's employment or profession has reasonable cause to suspect or believe that any person who is being educated by the Technical Education and Career System or a local or regional board of education, other than as part of an adult education program, is a victim under the provisions of section 53a-70, 53a-70a, 53a-71, 53a-72a, 53a-72b or 53a-73a, and the perpetrator is a school employee shall report or cause a report to be made in accordance with the provisions of sections 17a-101b to 17a-101d, inclusive.

"(b) (1) Any person required to report under the provisions of this section who fails to make such report or fails to make such report within the time period prescribed in sections 17a-101b to 17a-101d, inclusive, and section 17a-103 shall be guilty of a class A misdemeanor, except that such person shall be guilty of a class E felony if (A) such violation is a subsequent violation, (B) such violation was wilful or intentional or due to gross negligence, or (C) such person had actual knowledge that (i) a child was abused or neglected, as described in section 46b-120, or (ii) a person was a victim described in subdivision (2) of subsection (a) of this section.

"(2) Any person who intentionally and unreasonably interferes with or prevents the making of a report pursuant to this section, or attempts or conspires to do so, shall be guilty of a class D felony. . . .

\* \* \*

"(d) For purposes of this section and section 17a-101b, a mandated reporter's suspicion or belief may be based on factors including, but not limited to, observations, allegations, facts or statements by a child, victim, as described in subdivision (2) of subsection (a) of this section, or third party. Such suspicion or belief does not require certainty or probable cause."

Section 17a-101a, like § 17a-101, has undergone significant revisions since 2013. See, e.g., Public Acts 2017, No. 17-237, §§ 95 and 96; Public Acts 2015, No. 15-205, § 2; see also footnote 4 of this opinion. Those revisions do not have any effect on this appeal, and, like the trial court and the parties, we refer to the current revision of the statute.

[6] Andrea Donovan, a paraprofessional employed by the board, was present for this exchange; she believed that John Doe I had "teas[ed]" Allison in class by acting as a "prankster" or "jokester . . . ." Afterward, Donovan told Allison that she believed that John Doe I was very mature for a freshman, which was a view that had been shared by several other teachers at the high school. Donovan also shared that John Doe I had been attracting an unusual amount of attention for a freshman—even from senior girls, who had been asking him to the prom.

[7] John Doe I testified at his deposition that he felt uneasy during his meetings with Allison because he suspected that Robert did not like him, and she had told him that Robert did not like how much time they were spending together.

[8] John Doe III's relationship with Allison did not come to light until more than one year later. In the spring of 2015, he asked his guidance counselor, Christine Coyle, to allow him to transfer out of Robert's class, but he did not disclose any personal involvement with Allison to Coyle, and she believed that his request was because of his friendship with John Doe I.

[9] Allison also began to draw attention online, particularly on a now defunct social media app called Yik Yak, which permitted users to post discussions anonymously based on their location. The ubiquity of Yik Yak's use by students resulted in its ban from the high school's Wi-Fi network because of its reputation for enabling cyberbullying and other student conflicts. Allison first learned of this online attention on Yik Yak in the spring of 2014, when she accompanied some female students to Salutari's office to report some negative or sexual comments that had been made on the app about those students. Salutari was already aware of her mentions on the app, as were other teachers, with one, Paul Coppola, jokingly calling Allison an "Internet sensation . . . ." She then informed Salutari of the sexual nature

of the comments; because of Yik Yak's anonymous nature, she did not know who had made them. Salutari informed Phil Rosati, the high school's school resource police officer, of Allison's complaint about the Yik Yak post, although he was skeptical that anything could be done because there was no illegal content and the post was anonymous. On Rosati's advice, Salutari told Allison to keep Salutari informed if there were any more posts and if she heard the names of any students who might be involved; Rosati himself offered to continue to monitor the situation, as he often first learned of problems directly from students.

[10] The plaintiffs also emphasize that Allison dressed similarly on runs through town, attracting attention from motorists who would honk their horns. They claim that this was unusual behavior, given that many teachers make efforts to avoid running into students and their families outside of school.

[11] John Doe III claims that Allison's attire exposed her breasts and genitalia to the students, which constituted "a form of mental sexual abuse" that triggered the football coaches' reporting obligations. The cited deposition transcripts do not, however, support the assertion of actual exposure, indicating only that the color of her thong undergarment and the outlines of her buttocks were visible through the thin fabric of her athletic shorts; John Doe III testified that he could not see any skin color through the fabric.

[12] One assistant coach, Erick Becker, stated that he was "pretty darn surprised" about Allison wearing only a sports bra and thought the attire was inappropriate in a school setting. He thought she was trying to attract the attention of the coaching staff. He nevertheless viewed any locker room talk about Allison's appearance to be inappropriate commentary on a woman's body, and he attempted to avoid such conversations.

[13] Although there was no formal dress code for student athletes, it was undisputed that the female students at the high school would have been directed to cover up had they been dressed similarly at an athletic practice. John Doe II testified that Allison's shorts were consistent with what the female student athletes wore to practice, but he thought it was "unusual" for an "authority figure" not to wear a tank top to cover a sports bra, given that the female student athletes would not be allowed to dress similarly.

[14] During another episode in which Robert was concerned about Allison's conduct at the high school, he asked another department head, Peter Nye, to speak to Allison about her attire, namely, the propriety of a slim fitting red dress and high heeled shoes that she had worn to school, including for a back-to-school night with parents. Robert was upset that "people were talking" about Allison's dress, and Nye himself—who did not think the dress was inappropriate—had heard approximately six conversations about it among faculty and staff members who believed that Allison wore that dress to highlight her recent weight loss. Mia Corvino, a female colleague, similarly did not believe that the dress was inappropriate or excessively revealing. When Robert and Nye met with Allison, the conversation ended abruptly when she said that Principal Salutari "likes the way I dress." Robert and Nye did not escalate the matter further because they believed that Salutari would not be receptive to their concerns about her attire, especially as there was no dress code for faculty and staff at the high school, and it would have been difficult from a labor relations perspective to approach that issue with a faculty or staff member.

[15] Robert testified, however, that this comment was unconnected to the conversation with the football players, and he did not believe that she was engaging or was going to engage in sexual conduct with them; instead, he intended to shock her given the negative effect technology had been having on their family and his anger that he was carrying the majority of the domestic responsibilities in their household.

[16] See generally R. Marchese, Land of July: A Real Life Scandal of Sex & Social Media at a Connecticut High School (2018).

[17] John Doe II and John Doe III also claimed indemnity from the town and from the board pursuant to General Statutes §§ 7-465 and 10-235, respectively, for the negligence of Salutari. John Doe II also brought claims against Allison personally for assault and for negligent and intentional infliction of emotional distress. See footnote 3 of this opinion.

[18] The trial court then applied these principles to conclude that common-law immunity for discretionary acts similarly barred attempts by John Doe II and John Doe III to use an indemnification theory under General Statutes §§ 7-465 and 10-235 to hold the board liable for Salutari's alleged negligence, including a breach of any policy.

[19] The trial court nevertheless considered the merits of this claim, as it

rejected John Doe III's assertions that the defendants breached a duty to monitor the security video cameras in the hallways, which would have shown when he entered Allison's classroom. The court relied on Salutari's testimony that he or the police view the camera footage only when there is a reported event and that the video footage is automatically erased every few weeks when the storage is full. The court stated that, "[w]ithout [John Doe III's] reporting [Allison's] conduct, there was no reason for the [high] school or the police department to watch the security camera footage."

[20] The defendants also argue that Robert had no duty to report under § 17a-101a because he was not acting within the scope of his employment when he remarked, with respect to Allison's interaction with the three football players at a Friday night game, that "we're going to read about [you] in the newspaper someday" or when he learned of her attracting attention while running through town. We need not address this scope of employment argument because, even if we assume, without deciding, that Robert's duties as a mandated reporter extended beyond school hours, we conclude that the facts of this case, viewed both individually and collectively, did not give rise to a reasonable suspicion of abuse or imminent abuse.

[21] See Fed. R. Evid. 412, advisory committee notes.

[22] Numerous Superior Court decisions, which were followed by the trial court in this case, hold to this effect. See, e.g., *Doe* v. *Kennedy*, Superior Court, judicial district of Waterbury, Docket No. CV-09-5013921-S (November 29, 2012) (55 Conn. L. Rptr. 193, 196).

[23] We note that Allison had told Mia Corvino, a colleague, that John Doe I, among other male students, had a crush on her; Corvino believed that Allison properly laughed that off and acted appropriately and professionally. Corvino had heard during her classes that other boys had similar crushes on Allison, which she did not consider unusual; it was "the nature of the business" for some students to have crushes on teachers and the responsibility of the teachers to respond appropriately.

[24] John Doe II identifies the following seventeen facts that he claims establish reasonable cause to suspect that Allison was sexually abusing him: (1) Robert, as her husband and department head, "thought her dress and appearance [were] so inappropriate that he asked another teacher to address the issue with her"; (2) Robert testified about an evening at a high school football game where he "saw some players flirting with [Allison], and he commented to her that 'we're going to read about [you] in the [newspaper] someday' "; (3) Allison and Robert "routinely fought with each other—in front of students and staff—in order to start a fight or make a scene for the purpose of making [Robert] jealous"; (4) Robert "testified that [Allison's] personality had changed and that she was disappointed that the students no longer flirted with her—a fact she attributed to her 'mom' status"; (5) "on at least one occasion, Allison . . . sent John Doe I a bagel during school hours and in front of students and other teachers"; (6) "in her role as yearbook [advisor], [Allison] required John Doe II to change his yearbook quote at least five times, each time requiring him to be pulled out of a class and meet with her in person"; (7) "on some of these occasions, [Allison] would call [some] of [John Doe II's] teachers to request that he come to her classroom for the ostensible purpose of discussing his yearbook quote"; (8) "students commented to [John] Doe II that it was unusual to see an authority [figure] remove her tank top to reveal only a sports bra during a workout with the football team"; (9) "it was not permitted for the female student athletes to wear only their sports bras"; (10) "during the summer football program, [John] Doe II observed [Allison] paying special attention to [John] Doe I"; (11) "[John] Doe I and [Allison] were exchanging private messages on Instagram, and [John] Doe II learned that it turned into flirting"; (12) Allison "had multiple conversations with the football coaches about her attire, including one conversation [during which a] coach asked her to wear her tight fitting pink shorts again"; (13) Allison "testified that she believes much of her conduct at the time was designed to fuel a need for attention she did not feel she was getting through her marriage"; (14) Allison "testified that the coaches flirted with her incessantly"; (15) "an assistant coach, Erick Becker, testified that [Allison] dressed provocatively such that it was hard not to notice"; (16) "Becker further testified that it was an inappropriate way to dress around students"; and (17) "Becker and another coach had a conversation about the fact that Allison . . . appeared to be trying to get the attention of the students." (Emphasis omitted.)

[25] Looking beyond mandatory reporting statutes, we note that other Connecticut, federal, and sister state courts have held similarly in the context of negligent hiring and retention claims in considering whether it was fore-

seeable, for duty purposes, that a school or church employee would sexually abuse a child in his or her charge—some in cases with fact patterns akin to this one. See *Gough* v. *Saint Peter's Episcopal Church*, 143 Conn. App. 719, 731–32, 70 A.3d 190 (2013) (existence of church's sexual abuse prevention policies did not render it reasonably foreseeable that priest would sexually abuse teenage boy, given "the uncontested evidence . . . that no one who knew [the priest] saw, heard or observed anything that alerted them that [the priest] would harm anyone in any manner," and "the plaintiff averred that he did not think that anyone at [the church] was aware of the incident and that he did not disclose to anyone that the incident occurred until decades later"); *Doe 175 ex rel. Doe 175* v. *Columbia Heights School District, ISD No. 13*, 873 N.W.2d 352, 360–61 (Minn. App. 2016) (there were insufficient "red flags" to make sexual abuse of teenage girl by high school football coach foreseeable, even when (1) girl had yelled " 'I love you' " to him at practice, prompting another coach to say " '[t]hat's trouble' " and to ask her to leave, (2) girl and coach were spotted talking in parking lot, which was considered common occurrence, (3) girl used computer in weight room office while coach was supervising weight room, and (4) coach had been seen "alone with an unknown 'young girl' " in weight room on Saturday); *Dia CC* v. *Ithaca City School District*, 304 App. Div. 2d 955, 956, 758 N.Y.S.2d 197 ("[There was] no evidence that the [school] [d]istrict had any knowledge or notice that the [English as a Second Language] teacher may molest a student," given the teacher's good employment history for more than fifteen years "without incident," the teacher's clean background checks prior to hiring, and the fact that the student's "classroom teacher acted reasonably in releasing [him] to another teacher. Allowing a teacher to work alone one-on-one with a student did not breach the [school] [d]istrict's duty to supervise students . . . ." (Citation omitted.)), appeal denied, 100 N.Y.2d 506, 795 N.E.2d 38, 763 N.Y.S.2d 812 (2003); *A.H. ex rel. C.H.* v. *Church of God in Christ, Inc.*, 297 Va. 604, 629–30, 831 S.E.2d 460 (2019) (church's knowledge of past sexual abuse allegation did not trigger duty to terminate youth pastor when there was no pleading that church was aware of specifics or that allegation had been verified by social services or law enforcement authorities).

[26] As a preliminary matter, we note that John Doe II relies on *Haynes* v. *Middletown*, 314 Conn. 303, 315 n.8, 101 A.3d 249 (2014), and argues that the trial court improperly declined to address the issue on the ground that it had not been pleaded in the complaint. The defendants argue in response that the trial court correctly determined that John Doe II did not plead a theory of negligence arising from Allison's wardrobe, which distinguishes this case from *Haynes*, in which we held only that the plaintiff need not affirmatively plead an exception to discretionary act immunity. Given our conclusion with respect to the merits of John Doe II's claim, we need not address this pleading issue.

We also note that, although John Doe III raised a similar claim before the trial court, he does not renew it on appeal.

[27] The defendants also argue, as an alternative ground for affirming the judgments in the cases of John Doe II and John Doe III, that their failure to proffer expert testimony to support their claims as to the defective supervisory structure at the high school is inherently fatal to their negligence claims. We need not address this argument, given our conclusion as to discretionary act immunity.

[28] Describing as "unconscionable" this court's failure "to expand the exception for identifiable victim[s] to include any student on school property who has a right and purpose to be there," John Doe III asks us to overrule the line of cases standing for the proposition that the "only identifiable class of foreseeable victims that we have recognized for these purposes is that of school children attending public schools during school hours." *Durrant* v. *Board of Education*, 284 Conn. 91, 107, 931 A.2d 859 (2007); see also *St. Pierre* v. *Plainfield*, 326 Conn. 420, 437–38, 165 A.3d 148 (2017) (citing cases). Because we assume, without deciding, that John Doe II and John Doe III were identifiable persons at all relevant times, we do not address this request.

[29] Contrary to John Doe III's characterization of her attire as "a form of mental sexual abuse," there is no evidence that she actually exposed any intimate body parts to him or any other students at the football practices. See footnote 11 of this opinion.